J-A29017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DOUGLAS COBURN | |
| Appellant | No. 41 WDA 2016 |

Appeal from the Judgment of Sentence July 15, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0012781-2014

BEFORE:  DUBOW, J., MOULTON, J., and MUSMANNO, J.

MEMORANDUM BY MOULTON, J.:          **FILED FEBRUARY 08, 2017**

Douglas Coburn appeals from the July 15, 2015 judgment of sentence entered in the Allegheny County Court of Common Pleas following his bench trial convictions for criminal attempt – homicide, aggravated assault (serious bodily injury inflicted), recklessly endangering another person ("REAP"), carrying a firearm without a license, and persons not to possess a firearm.[1] We affirm.

On June 11, 2014, police received a 911 call reporting multiple shots fired at Hi-View Gardens Apartments ("Hi-View") in McKeesport.  Upon arriving at the scene, police found Kaleel Herring lying on the walkway leading up to building four.  Herring suffered multiple gunshot wounds and

_____

    [1] 18 Pa.C.S. §§ 901(a), 2702(a)(1), 2705, 6106(a)(1), and 6105(a)(1), respectively.

was airlifted to the University of Pittsburgh Medical Center – Presbyterian ("UPMC") for treatment.

Officer Jeremy Zuber of the McKeesport Police Department was the first to arrive at the crime scene. N.T. Trial, 4/13/16-4/16/16, at 114.[2] Upon pulling into the apartment complex, security guards Robert Demuth and Michael Acrie waived Officer Zuber over to the area where Kaleel Herring lay wounded. *Id.* at 115. Police secured the crime scene and began an investigation.

Emily Wilkinson of the Allegheny County Medical Examiner's Mobile Crime Unit processed the crime scene. Wilkinson recovered 13 shell casings and two projectile fragments from the parking lot. N.T. Trial at 192. She also found two vehicles with suspected ballistic projectile damage. Wilkinson also discovered similar ballistic projectile damage in a building just beyond where Herring was found. *Id.* at 194-97. The shell casings recovered were identified as having chambered nine-millimeter Luger projectiles. *Id.* at 197.

McKeesport police already knew Herring and knew he was also known by the name "Magic." *Id.* at 311. They were also aware that Coburn frequented Hi-View. *Id.* at 311-12. McKeesport police handed their

---

[2] The trial transcript was compiled into one transcript and was not separately paginated for each day of trial.

investigation off to the Allegheny County Police, led by Detective Daniel Mayer. *Id.* at 314.

Detective Mayer and Herring spoke at UPMC on the afternoon of the 11th.[3] *Id.* at 318. Detective Mayer did not record the conversation but took notes. *Id.* at 363-65.[4] Detective Mayer testified that during the interview, Herring told Detective Mayer that Coburn was the person who shot him. *Id.* at 323. Using prior information recovered from the crime scene, as well as security camera footage of Hi-View, Detective Mayer had identified Coburn as a suspect and brought a color photograph of Coburn obtained from the Pennsylvania Justice Network ("JNET"). *Id.* at 324. Detective Mayer testified that Herring circled and initialed Coburn's photograph. *Id.* at 325.

Detective Mayer then received a call from Detective Stephen Hitchings, who stated that he was in Pittsburgh's North Side neighborhood attempting to contact Stefon Dixon, who was identified as a suspect from the video footage. *Id.* at 327. Upon arriving at the North Side address, Detective Mayer found a blue Ford Mustang, which Hi-View security guards had seen

---

[3] Allegheny County Police Homicide Division Detective Jarret Kaspryszyn went to the hospital before Detective Mayer attempted to contact Herring. N.T. Trial at 316. Detective Kaspryszyn was unable to speak with Herring at that time because Herring was undergoing emergency surgery. *Id.* at 317. Detective Mayer was the first detective who actually spoke to Herring. *Id.*

[4] Detective Mayer stated that he did not give Herring an opportunity to review these notes. N.T. Trial at 366.

the suspects enter, drive into the area of the shooting, and exit the apartments at a high rate of speed after the shooting. *Id.* at 29-30; 328. Detective Mayer secured the blue Mustang, in which he saw a fired cartridge casing on the rear passenger seat. *Id.* at 328-29. Detectives Mayer and Hitchings took Dixon into custody. *Id.* at 329-30. After waiving his *Miranda*[5] rights, Dixon admitted that he was at Hi-View to visit friends and drove his blue Mustang while intoxicated. *Id.* at 339. Dixon stated that he heard the gunshots at close range and immediately sped off from the apartments. *Id.* at 340. Dixon declined to provide a formal statement but reviewed and signed Detective Mayer's notes. *Id.* at 343.

Police subsequently applied for and received arrest warrants for Dixon and Coburn. *Id.* at 346. On June 29, 2014, police went to serve the arrest warrant on Coburn at Coburn's sister's residence.[6] *Id.* at 374-75. When they attempted to serve the warrant, Coburn fled on foot.[7] *Id.* at 463-64. Police stopped Coburn when he ran into a patrol car. *Id.* at 464. Police

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] Coburn's father, who was also present, stated that Coburn had been sleeping at the residence. N.T. Trial at 382.

[7] Dixon also fled when police attempted to serve an arrest warrant on him. N.T. Trial at 389. Police found Dixon hiding behind a furnace in the home where police had made contact with him before. *Id.* at 390-91. After obtaining the homeowner's consent, police searched the home and recovered clothing similar to that seen on the video footage and described by the Hi-View security guards. *Id.* at 391-94.

received consent from Coburn's sister to search the residence. *Id.* at 376, 382. Upon searching the home, Detective Hitchings of the Allegheny County Police recovered a Glock nine-millimeter pistol. *Id.* at 397. An extended magazine, capable of holding 30 rounds, was attached to the pistol and contained six rounds of live ammunition made by several manufacturers. *Id.* at 399.

Coburn and Dixon waived their rights to a jury trial and proceeded to a joint bench trial, which was held on April 13-16, 2015.

The Commonwealth called Robert Demuth, a Hi-View security guard who was on duty on the night of June 11, 2014. Demuth recalled hearing a disturbance between 12:30 and 12:45 a.m. near building two. *Id.* at 20-21. Demuth and his partner, Michael Acrie, walked out to a grassy area in front of building three, where he heard Kaleel Herring and another man boisterously talking and using explicit language. *Id.* at 22-25. He told Herring and his friend that they had to leave because they were not residents of the apartments. *Id.* at 26.

Demuth then testified that Herring, while leaving, ducked between buildings one and two and gained access to building two. *Id.* at 27-28. Demuth then saw three black males leave building three, walk to the parking lot, and enter a blue Ford Mustang. *Id.* at 28-29. Demuth described the three men and identified Coburn as having been seated in the front passenger seat. *Id.* at 29-33, 49, 55. Demuth then saw the car leave the parking lot headed toward the front of the Hi-View property, continue left

past the exit, and come back around towards building four. *Id.* at 34-36. About four seconds after that, Demuth heard a number of gunshots and ran across the property to find Herring lying on the sidewalk in front of building four. *Id.* at 36-37. Demuth called 911 immediately. *Id.* at 41.

Michael Acrie corroborated Demuth's testimony and testified that he saw the blue Ford Mustang earlier in the day. *Id.* at 83-84. After asking Herring and his associate to leave the apartment complex, Acrie went to the steps near the breezeway between buildings three and four. *Id.* at 85. Acrie saw the blue Mustang heading toward building four. *Id.* at 86. He then heard multiple shots fired from the area near building four. *Id.* at 87. Acrie ducked behind a wall when he heard the shots, and re-emerged to see the blue Mustang come past the breezeway and exit the apartment complex onto 6th Street at a high rate of speed. *Id.* at 88-89. Acrie ran over to the scene, where he found Demuth and Herring on the sidewalk in front of building four. *Id.* at 90.

The Commonwealth also called Derek Ambush, who testified that he went to Hi-View with Dixon in the blue Mustang on the night of the shooting. *Id.* at 129-32. Ambush stated that they visited a few female acquaintances of Dixon and that he and the others were under the influence. *Id.* at 132-34. Ambush stated that he saw someone that may have been Coburn when they arrived, but he did not see Coburn again that evening. *Id.* at 137-38. When shown the video footage from the day of the incident, however, Ambush stated that the three men in the video were himself, Dixon, and

someone that looked like Coburn. *Id.* at 145-46. Ambush stated that he could not remember how he got home that evening, but did recall what he had been drinking and the drugs he had taken. *Id.* at 154, 157, 176. He also stated that he did not possess a handgun that evening. *Id.* at 149. Ambush testified that when they got into the car to leave Hi-View, Dixon said he was making a "jitney trip," giving Coburn a ride from Hi-View to another location. *Id.* at 162-65. When confronted on cross-examination with a fired cartridge casing recovered from the rear passenger seat of the blue Mustang, Ambush could not explain how the casing ended up in the car. *Id.* at 165-66.

The Commonwealth also called Wilkinson, who testified about the fired cartridge casings and projectiles recovered from the scene. After police seized Dixon's blue Mustang, Wilkinson also processed the evidence found in that car, including a nine-millimeter fired cartridge casing in the center console.[8] *Id.* at 211-13. Wilkinson was unable to obtain DNA evidence from the vehicle. *Id.* at 215-16.

The Commonwealth then called Herring, who testified that he had been drinking during the day on June 11th and went to see his "girl" at Hi-View. *Id.* at 245-47. Herring then went to the apartment of Dontell Victor,

_____

[8] The Commonwealth also called Detective Kasprysyzn, who stated that, when Wilkinson processed the car, a second fired cartridge casing was found on the rear passenger seat of the vehicle. N.T. Trial at 443.

where he began shouting and was told to go outside. *Id.* at 250-51. He then began to talk to the women in Victor's apartment while standing in the middle courtyard of the Hi-View complex, at which point Demuth and Acrie came over and told Herring and his friend that they had to leave. *Id.* at 253-54. Herring said he then began walking toward the parking lot, heard shots, and started running. *Id.* at 255-56. His body then "gave out" and his face smacked the ground. *Id.* at 258.

Herring next remembered waking up in the hospital. *Id.* at 261. Herring stated that he remembered being interviewed by Detective Mayer, but that he had not seen anything and he was "drugged up" and felt pressured by Detective Mayer. *Id.* at 267-68. The Commonwealth confronted Herring with statements that he allegedly made to Detective Mayer, which Herring either denied or indicated that he was so "drugged up" that he could not have given a truthful answer. *Id.* at 266-71, 274-82, 286-87, 296-302, 304-08. Herring remembered being shown the photograph of Coburn, but stated that if he circled and signed the photograph, it was because he was scared of Detective Mayer. *Id.* at 274, 280-82.

The Commonwealth then called Detective Mayer, who testified that Herring was cooperative and that he never raised his voice or threatened Herring during the interview at UPMC. *Id.* at 321. The Commonwealth then asked about the content of Herring's statements:

> [COMMONWEALTH]: What did [Herring] have to say about
> who had shot him at the time?

[DIXON'S COUNSEL]: I am going to object to hearsay.[9]

THE COURT: I am assuming that – well, I am assuming you are offering it as a prior consistent statement?

[COMMONWEALTH]: Right, prior statement, inconsistent with what Kaleel Herring has said in court.

THE COURT: It is overruled. Go ahead.

*Id.* at 322. Detective Mayer then disclosed that Herring said he had seen a blue Mustang with its engine running in the center parking lot and recognized it as Dixon's car. *Id.* at 322. He also stated that Coburn opened the window, reached his right hand out and opened fire on him. *Id.* at 323. When shown the photograph, Herring indicated that Coburn was the shooter, circled the photograph and placed his initials on it. *Id.* at 323-24. He then testified as to his contact with Dixon as described above.[10] *Id.* at 325-46; *supra* at 3-4.

The Commonwealth also called Thomas Morgan of the Allegheny County Medical Examiner's Office, who is a firearms and tool-mark identification expert. N.T. Trial at 414-15. Morgan testified that he examined the 13 fired cartridge casings recovered and the Glock pistol

---

[9] Coburn's counsel later joined this objection. N.T. Trial at 333-34. At that time, the trial court indicated that the objection was overruled as a prior inconsistent statement. *Id.* at 334.

[10] The Commonwealth also called Detective Michael Caruso of the Allegheny County Police Homicide Division, who testified that Coburn fled as they attempted to serve the arrest warrant, he had consent from Coburn's sister to search the residence, and he recovered the Glock pistol. N.T. Trial at 375-99.

recovered from Coburn's sister's residence. He stated that these were of the same caliber and test firings of the seized firearm confirmed that the 13 casings recovered were fired from the seized firearm. *Id.* at 416-429.

The Commonwealth also played two phone calls recorded in the Allegheny County Jail. The first call was between Coburn and Heid Nothdurft, wherein Coburn indicated that he was mad that his sister had given police consent to search her residence and Nothdurft told Coburn that Dixon was awaiting his phone call:

> NOTHDURFT: Basically he just, just call him. He knows you're going to be calling him.
>
> COBURN: Hmm. But now, I got back to the bullpen. I don't even give a fuck. I don't even give a fuck about that pistol. Like, now they got to put it in my hand and the crime scene. They got to tell you I'm the one who fired that gun without nobody testifying on me. That's going to be hard as fuck.
>
> NOTHDURFT: And they don't have a fucking victim either so.
>
> COBURN: Huh.

Cmwlth.'s Ex. 91(A). The second call introduced was between Coburn and Dixon, wherein Coburn accused Dixon of giving a statement that resulted in the charges and talked to Dixon[11] about the pending charges:

> COBURN: What's up? What's the deal when we going over next week dog.
>
> DIXON: Man I already told [yo]u what the deal was game.

_____

[11] Dixon was on house arrest when this call was recorded.

- 10 -

COBURN: Right. Now my lawyer was saying some other shit. Some whole other shit. Now he said now everything is official but before when I went over, when we went over last night. He said some other shit until he went back up and came back down and said what he said.

DIXON: Naw, I told [yo]u dog. That shit that they gave [yo]u dog. That wasn't right. That was none of me dog.

COBURN: So that shit that they typed up and shit, you ain't say none of that shit?

DIXON: Naw, I told them I was doing a jit[n]ey trip dog.

COBURN: Ehhh.

DIXON: I told you what I said dog.

COBURN: My lawyer and them niggas tried to make it seem like something else . . . put you under that door and said you just blatantly just saying my name and shit.

DIXON: Naw dog. I said I didn't know who [yo]u was.

COBURN: Huh?

DIXON: I said I ain't know who [yo]u was. I said (*inaudible*) . . . someone asked me for a ride. They said which way did [yo]u go? I said I went towards century three.

\* \* \*

COBURN: Listen, listen, listen, listen . . . . They don't got nothing against neither one of us. They need someone. They need a witness to testify on both of us. If no one is testifying, the homicide detectives can't testify. They can't say they was there. It's hearsay. They can't convict us. They need Magic to come testify. Magic told them mother fuckers I'm not testifying when I'm done w[ith] this case. The paperwork said he was drunk. Remember he said the police made him say, made him say my name. He said the police made me say he saw the blue mustang and he saw me. He said in there, they made him lie which is consistent with an innocent man was incarcerated and he wants all charges dropped towards both of us. My lawyer said DA don't know he got it yet. But he's bringing it to

trial. He is going to show them at the last minute. They haven't talked to [M]agic since last June . . . . Since he was in the hospital. When he got released, they haven't heard from him since. Magic gotta come testify for anyone to get convicted. Magic's not coming to testify. Reepe is not going to testify. They gotta convict me. They gotta put the gun in my hand at trial. They can't do that cause they don't got no finger prints on it. They don't got nothing linking me to the fucking scene. They don't go nothing, Camera. When I had my prelim, no one could identify me on camera. Nobody.

DIXON: Right.

COBURN: Except the homicide detectives, the homicide detectives said I think it's him. Man we don't gotta do nothing but go there and see what they got. They don't got nothing. They got a pistol. Okay. And the discovery says the shells . . . [t]hey don't know if the shells were shot from that gun or not. Cause they don't, the rain fucked up the shells. The[y] don't got shit dog. That's why I am like damn.

Cmwlth.'s Ex 91(B). Coburn also indicated that he had spoken to Herring while Herring was in the hospital:[12]

COBURN: . . . . I talked to Magic when he was in the hospital. He called me and said you better check your co-d[efendant] I am leaving this shit in the streets. I'm like yeah dog sounds good. I am gonna see when I get locked up and see the paperwork and shit. So now I gotta get money up for my shit. Come to find out, my bond is 20,000. I'm stuck like. I'm stuck. Then I get to work magic's but. Bang. Then I get my discovery. It got your statement and his statement.

_____

[12] Before resting, Coburn's counsel called Herring. Herring testified that, while incarcerated in the Allegheny County Jail, he wrote Coburn a letter through a "kite," in which he stated that in August 2014, he told the Allegheny County District Attorney that there were inaccuracies in a police report the District Attorney's Office had shown him. N.T. Trial at 522-25.

*Id.*

The Commonwealth also called Detective Michael Feeney of the Allegheny County Police Homicide Division. Detective Feeney testified as to the video footage recovered from Hi-View's surveillance system. *Id.* at 493-95. Detective Feeney stated that the video directed detectives towards projectiles recovered from building four. *Id.* at 496-98. He then led the trial court through the video footage, showing: three males leave building three headed towards the parking lot and vehicle headlights turn on; a vehicle passing the front entrance area and returning to the parking area, where a figure walked towards the vehicle; two sparks and a figure running out of view of the camera facing the parking area; and a vehicle leaving the complex. *Id.* at 498-504.

On April 16, 2015, the trial court convicted Coburn of the aforementioned offenses and found him not guilty of conspiracy to commit homicide. On July 15, 2015, the trial court sentenced Coburn to 9 to 18 years' incarceration on the criminal attempt – homicide conviction. The trial court imposed no further penalty on the remaining convictions.

Coburn filed post-sentence motions on July 27, 2015, asking the trial court to reconsider his sentence and asserting that he was entitled to a new trial because the verdict was against the weight of the evidence. On August 18, 2015, the trial court granted Coburn's counsel leave to withdraw and appointed Coburn a new attorney for his post-sentence motions. On September 15, 2015, Coburn's new counsel moved for an extension of time

to file supplemental post-trial motions. The trial court granted this request and set the deadline for 21 days after counsel received the trial transcripts. Coburn filed supplemental post-sentence motions on October 23, 2015, arguing that his jury trial waiver was deficient. The trial court held a hearing on these post-sentence motions on December 11, 2015, and denied the motions that same day. On January 6, 2016, Coburn filed his notice of appeal.

Coburn raises two issues on appeal:[13]

1. Did the trial court err in permitting Detective Meyer [sic] to testify, over an objection to hearsay, as to what the victim, Kaleel Herring, told him when interviewed at Herring's hospital room where:

   a. The testimony was not proffered for a limited scope, nor did the court indicate upon the record it was being received for a limited scope, where the requisites for admission of the evidence as substantive evidence were not present;

   b. The testimony did not constitute proper impeachment evidence;

   c. The testimony of Kaleel Herring, if it was received solely for impeachment and was admissible for that purpose, its admission was still in error as its prejudicial impact greatly outweighed its probative

_____

[13] In his Pennsylvania Rule of Appellate Procedure 1925 statement, Coburn also raised an issue regarding his motion to suppress the seized handgun and a sentencing issue pursuant to **Apprendi v. New Jersey**, 530 U.S. 466 (2000). However, Coburn has abandoned these issues in this Court. **See Commonwealth v. Dunphy**, 20 A.3d 1215, 1218 (Pa.Super. 2011) (concluding that questions presented in appellant's Rule 1925(b) statement but not subsequently developed in his brief are abandoned).

value as impeachment evidence, particularly when Herring was subject to substantial impeachment relating to the inconsistencies between his trial testimony and what he told Detective Mayer at the hospital.

2. If the testimony of Detective Mayer relating to what Kaleel Herring told him at the hospital, admitted as an "inconsistent statement," was received solely as impeachment evidence, then the evidence was insufficient to support the convictions for attempted homicide, aggravated assault and recklessly endangering another person as the evidence was not sufficient to establish that [Coburn] fired the gun which inflicted the various gunshot wounds the victim suffered.

Coburn's Br. at 4 (sub-argument lettering added).

Coburn's first issue contains three arguments that the trial court erred as a matter of law by permitting Detective Mayer to testify as to statements made by Kaleel Herring in the hospital. Our standard of review on evidentiary challenges is well settled:

> The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Dent*, 837 A.2d 571, 577 (Pa.Super. 2003) (internal quotations and citations omitted).

Coburn first argues that the trial court should have indicated that it was receiving Mayer's testimony for the limited purpose of impeaching Herring with a prior inconsistent statement, as the testimony received by the

trial court did not meet the prerequisites for admission as substantive evidence. Coburn's Br. at 15-16. Because the trial court did not state on the record how it was receiving the evidence, Coburn asserts that we must "presume[] that [the testimony] was not received in a limited scope by the trial court." *Id.* at 16-17.

The Commonwealth agrees "that Herring's prior inconsistent statements were not admissible substantively," Cmwlth.'s Br. at 18, but argues that the trial court was not required to state in what capacity it was receiving the prior inconsistent statement testimony, because "the trial court, sitting as the trier of fact, is presumed to know the law, ignore prejudicial statements, and disregard inadmissible evidence," *Id.* at 22 (quoting ***Commonwealth v. Konias***, 136 A.3d 1014, 1022 (Pa.Super.), *app. denied*, 145 A.3d 724 (Pa. 2016)) (internal quotation omitted). According to the Commonwealth, the trial court "was aware that Det[ective] Mayer's testimony was being offered as a prior inconsistent statement, and it may be presumed . . . that he equally was aware that the prior inconsistent statement did not meet the . . . test[14] for admission as substantive evidence." Cmwlth's Br. at 22.

---

[14] Pennsylvania Rule of Evidence 803.1(1) governs the admissibility of prior inconsistent statements of a declarant-witness:

> **(1) Prior Inconsistent Statement of Declarant-Witness.** A prior statement by a declarant-witness that is inconsistent with the declarant-witness's testimony and:

*(Footnote Continued Next Page)*

We agree with the Commonwealth. As noted above, we presume that "a trial court, acting as the finder of fact, is presumed to know the law, ignore prejudicial statements, and **disregard inadmissible evidence**."[15] ***Commonwealth v. Smith***, 97 A.3d 782, 788 (Pa.Super. 2014) (emphasis added). Further, the trial court's Rule 1925(a) opinion makes clear that the court considered this portion of Detective Mayer's testimony solely for impeachment of Herring, and not as substantive evidence. ***See*** 1925(a) Op. at 14-16 (noting distinction between Pa.R.Evid. 803.1(1) and Pa.R.Evid. 613, and stating that "Detective Mayer's testimony was a very effective use of impeachment testimony on the behalf of the prosecution"). Therefore, Coburn's first argument is meritless.

Coburn next argues that Detective Mayer's testimony was not admissible for impeachment purposes. According to Coburn, "a witness may

*(Footnote Continued)* ——————————

> (A)  was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition;
>
> (B)  is a writing signed and adopted by the declarant; or
>
> (C)  is a verbatim contemporaneous electronic, audiotaped, or videotaped recording of an oral statement.

Pa.R.E. 803.1(1). Rule 803.1(1) adopted prior Pennsylvania case law on the substantive admission of prior inconsistent statements. ***See id.*** cmt.

[15] We also note that, in its closing statement, the Commonwealth did not use the substance of Herring's prior inconsistent statements. N.T. Trial, at 557-69.

be impeached with evidence that witness has made an inconsistent statement but that impeachment is not, by itself, a basis for admission of an inconsistent statement that is hearsay." Coburn's Br. at 17-18. Coburn asserts that Herring's statement was only admissible as impeachment evidence if it "was made under oath, in writing and adopted by the declarant, or a verbatim contemporaneous recording." *Id.* at 18-19. Further, Coburn argues that the "statement" was actually Detective Mayer's note of a witness's interview, which, to be used for impeachment, must be adopted by the witness. *Id.* at 19. Because Herring did not adopt Detective Mayer's notes, Coburn argues that the trial court inappropriately received Detective Mayer's testimony on Herring's prior inconsistent statements. *Id.* at 19-20. We disagree.

Pennsylvania Rule of Evidence 613(b) sets forth the requirements for using extrinsic evidence of a witness's prior inconsistent statement:

> **(b) Extrinsic Evidence of a Witness's Prior Inconsistent Statement.** Unless the interests of justice otherwise require, extrinsic evidence of a witness's prior inconsistent statement is admissible only if, during the examination of the witness,
>
> (1) the statement, if written, is shown to, or if not written, its contents are disclosed to, the witness;
>
> (2) the witness is given an opportunity to explain or deny the making of the statement; and
>
> (3) an adverse party is given an opportunity to question the witness.

Pa.R.E. 613(b).  In **Commonwealth v. Charleston**, 16 A.3d 505 (Pa.Super. 2011), *abrogated on other grounds by In re L.J.*, 79 A.3d 1073, 1087 (Pa. 2013), we addressed the admissibility of prior inconsistent statements, for impeachment, as testified to by others.   The statement at issue in **Charleston** involved a conversation between the appellant's mother and her friend, in which the mother told the friend that appellant said he planned to rob the victim.  **Id.** at 526-27.  After mother denied having the conversation with the friend, the Commonwealth called the friend, for the purpose of "impeach[ing the mother's] testimony wherein she denied ever having a conversation with [her friend] regarding [a]ppellant's intent to rob the victim."  **Id.** at 527.  Appellant objected, arguing that such testimony was hearsay, and the Commonwealth countered that the evidence was only being introduced to impeach the mother's credibility.  **Id.**

We concluded that the trial court did not abuse its discretion in admitting the friend's testimony solely for impeachment purposes:

> Upon review, we conclude the court did not abuse its discretion in admitting the evidence under Rule 613(b). Subsection one of the rule was complied with because the Commonwealth disclosed to [the mother] the contents of her statement to [her friend]. The Commonwealth also complied with subsection two because it asked [the mother] if she made the statement and she denied making it. Finally, subsection three was satisfied, as the defense was given an opportunity to question [the mother]. Therefore, [the friend's] testimony in which she relayed [the mother's] prior inconsistent statement was proper[l]y admitted for purposes of impeachment.

**Id.**

Here, we similarly conclude that the trial court did not abuse its discretion in admitting Detective Mayer's testimony on Herring's prior inconsistent statements to impeach Herring. The Commonwealth complied with subsection one of the rule by disclosing the contents of each statement to Herring during his direct testimony. N.T. Trial, at 266-71, 274-82, 286-87, 296-302, 304-08. Similarly, the Commonwealth met subsection two of the rule because Herring was given (and took) the opportunity to deny making the statements in question to Detective Mayer. *Id.* Finally, Coburn's counsel was given an opportunity to question Herring. *Id.* at 295-310. As in *Charleston*, the trial court here appropriately allowed the Commonwealth to elicit testimony from Detective Mayer regarding Herring's prior inconsistent statements to impeach Herring.

Further, Coburn's argument that Herring was not given an opportunity to review or adopt the statements made to Detective Mayer is without merit. The Commonwealth did not impeach Herring with notes or the statement, which would require some form of authentication, *see Commonwealth v. Simmons*, 662 A.2d 621, 638 (Pa. 1995), but instead used Detective Mayer's testimony to impeach Herring. Under these circumstances, there was no statement to authenticate and Coburn's means of testing the

veracity of these prior inconsistent statements was to cross-examine Detective Mayer.[16]

Coburn next argues that even if Mayer's testimony was proper for impeachment purposes, the trial court should have found that the testimony's "prejudicial effect greatly outweighed its probative value as impeachment evidence" under Pennsylvania Rule of Evidence 403. Coburn's Br. at 20. According to Coburn, the Commonwealth's inquiry into Herring's state of mind and the truthfulness of his interview with Detective Mayer was "essentially . . . a cross-examination of a Commonwealth witness," and, as such, the Commonwealth elicited answers that showed Herring provided answers to Detective Mayer that were inconsistent with his trial testimony. *Id.* at 21. Coburn asserts that the Commonwealth effectively impeached Herring by other means and "[t]he only point served by admission of the hearsay was to put in front of the factfinder direct evidence incriminating [Coburn.]" *Id.* at 22.

We conclude that Coburn waived this Rule 403 argument by failing to raise it before the trial court. When Coburn objected to Detective Mayer's testimony on Herring's statements, he joined Dixon's prior hearsay objection, which did not contain a separate prejudice ground. N.T. Trial at 322 ("I am going to object to hearsay."). It is well settled that "a party

_____

[16] Coburn's counsel cross-examined Detective Mayer regarding Herring's hospital statements. N.T. Trial at 356-367.

complaining, on appeal, of the admission of evidence in the [c]ourt below will be confined to the specific objection there made." ***Commonwealth v. Cousar***, 928 A.2d 1025, 1041 (Pa. 2007). Thus, where the grounds for objection are stated, "all other unspecified grounds are waived and cannot be raised for the first time on appeal." ***Commonwealth v. Bedford***, 50 A.3d 707, 713 (Pa.Super. 2012). Thus, when Coburn joined Dixon's objection to Detective Mayer's testimony as hearsay, he failed to preserve his Rule 403 claim.[17]

In his second issue, Coburn claims that, if Detective Mayer's testimony was received strictly for impeachment purposes, the evidence presented by the Commonwealth was insufficient to sustain Coburn's convictions for criminal attempt – homicide, aggravated assault (serious bodily injury inflicted), and REAP. Coburn's Br. at 24. According to Coburn, "the evidence established only that [he] was one of three individuals seated in a blue Mustang from which the shots that struck Kaleel Herring were fired." ***Id.*** at 25. Further, Coburn argues that the trial court relied on the jail phone calls to identify him as the shooter, noting that his co-defendant, Stefon Dixon, made similar comments about "leaving the matter in the

---

[17] Even if Coburn had preserved this issue for appeal, we would conclude that it lacks merit. Similar to Coburn's earlier issue regarding the substantive admission of Detective Mayer's testimony on Herring's prior inconsistent statements, we presume that the trial court knew the law and considered the statements in question only for their proper purpose. ***See Konias***, 136 A.3d at 1022.

streets" and such comments "are also completely consistent with an individual concerned because he was arrested for a crime to which he was in proximity." *Id.* at 26. Coburn also asserts that: his flight from police is not indicative of his guilt; the seizure of the weapon in his sister's home does not prove he was the shooter; and the photograph shown to Herring does not indicate him as a shooter without the hearsay testimony of Detective Mayer. *Id.* at 27-28. In addition, Coburn argues that the jail calls and his flight from arrest are not indicative of his guilt because Dixon was also recorded on the jail calls and fled from police, yet Dixon was found not guilty of all charges lodged against him. *Id.* at 26-27.

This Court's standard for reviewing sufficiency of the evidence claims is well settled:

> We must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail.
>
> The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact[-]finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Rodriguez*, 141 A.3d 523, 525 (Pa.Super. 2016) (quoting *Commonwealth v. Tarrach*, 42 A.3d 342, 345 (Pa.Super. 2012)).

"A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a). To establish attempted murder, the Commonwealth must show that the defendant took "a substantial step towards the commission of a killing, with the specific intent in mind to commit such an act." *In re R.D.*, 44 A.3d 657, 678 (Pa.Super. 2008). The Commonwealth may establish a *mens rea* of specific intent to kill solely through circumstantial evidence. *Id.* Further, "[t]he use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill." *Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007).

"A person may be convicted of aggravated assault graded as a first degree felony if he 'attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life.'" *Commonwealth v. Matthew*, 909 A.2d 1254, 1257 (Pa.Super. 2006) (quoting 18 Pa.C.S. § 2702(a)(1)). "Serious bodily injury" is "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301.

A person may be convicted of REAP "if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705. "Thus, the crime requires (1) a mens rea recklessness, (2) an actus reus some 'conduct,' (3) causation 'which places,' and (4) the achievement of a particular result 'danger,' to another person, of death or serious bodily injury." ***Commonwealth v. Trowbridge***, 395 A.2d 1337, 1340 (Pa.Super. 1978).

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that the Commonwealth presented sufficient evidence to support Coburn's convictions. The Commonwealth presented evidence that Coburn was present at the scene of the shooting, seated in the passenger seat of a blue Mustang. Multiple witnesses testified that the blue Mustang pulled out of the parking lot, passed by the only exit, and then returned to the parking lot. These witnesses then heard several shots from the vicinity of the parked car and saw the blue Mustang exit the apartment complex at a high rate of speed. Security video footage similarly shows flashes of light near the car. The police found a number of nine-millimeter fired cartridge casings in the blue Mustang and the parking lot, which, according to expert testimony, were discharged from the firearm seized from Coburn's sister's residence. Police also recovered a number of projectile fragments lodged in cars and buildings from the area where the car was parked.

In addition, the jail phone calls made by Coburn are strongly corroborative of guilt, indicating that Herring and Coburn intended to leave this matter out of the courts; that Coburn believed that he could not be convicted because the Commonwealth did not find his fingerprints on the gun; and that Coburn thought that Dixon may have spoken to the Police. Further, when police attempted to serve an arrest warrant on Coburn, he fled. The fact that Dixon was also recorded on the jail calls and fled from police is of no moment, as Dixon's actions do not bear on Coburn's culpability. We conclude that the Commonwealth presented sufficient evidence to support Coburn's convictions for criminal attempt – homicide, aggravated assault (serious bodily injury inflicted), and REAP.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  2/8/2017