J. S57012/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                     :           PENNSYLVANIA
                v.          :
                                     :
JESSE LUMBERGER,               :         No. 1238 WDA 2015
                                     :
           Appellant     :


Appeal from the Judgment of Sentence, February 23, 2015,
in the Court of Common Pleas of Allegheny County
Criminal Division at No. CP-02-CR-0003088-2014


BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN AND STRASSBURGER,* JJ.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:       **FILED OCTOBER 31, 2016**

Jesse Lumberger appeals from the judgment of sentence entered in the Court of Common Pleas of Allegheny County following his conviction in a waiver trial of two counts of robbery and one count each of theft by unlawful taking, terroristic threats, simple assault, and recklessly endangering another person.[1]  The trial court sentenced appellant to serve 10 to 20 years' imprisonment, followed by 5 years' probation.[2]  We affirm.

---

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3701(a)(1)(ii), 3701(a)(1)(vi), 3921(a), 2706(a)(1), 2701(a)(3), 2705, respectively.

[2] The trial court's Rule 1925(a) opinion reflects that it imposed a concurrent 10-year probationary term.  (Trial court opinion, 1/12/16 at 1.)  The February 23, 2015 sentencing order, however, reflects that the trial court imposed a concurrent 5-year probationary term.  (Order of sentence, 2/23/15; Docket #12.)

The trial court set forth the following factual history:

It is around 2:00 p.m. and Merlyn Fenton is at her teller window at the Huntingdon Bank in McKeesport. She is attending to a female customer on this 15th day of May, 2013. The customer is engaged in conversation with another customer, a man, who is waiting in line at Ms. Fenton's window. The dialogue allows Ms. Fenton a level of comfort to instruct the female customer to tell the male "to remove the cover off his face." The male immediately announced "this is a robbery." The man jumps over a low teller window designed to accommodate a disabled customer and shouts: "I want money." In his hand is a long object. It looks like a knife. It might be a foot long. Ms. Fenton backed up. She then "took all the money that he demanded and [gave] it to him."[Footnote 2] He then ran out of the bank. Ms. Fenton then closed the bank's door behind him.[Footnote 3]

[Footnote 2] It was later determined that $1[,]595.00 was taken.

[Footnote 3] Commonwealth's exhibits 2-8 are still photographs taken from interior surveillance cameras and corroborate Ms. Fenton's oral rendition.

Ms. Fenton, a diminutive 5'2", described the robber as "thin", "[a]lot taller than me", a black man with "black hair", "very young" and he wore clothing that was "not . . . bulky".

Jose Vasquez was also in the bank. He was a manager. He noticed the robber wearing a "grayish shirt" with a "doo-rag over his face",[Footnote 4] with a slim build and stood about 5'10".

[Footnote 4] Urban Dictionary of "do-rag" is: a cloth, often made of nylon and resembling a panty hose, worn over the hair of one's head.

Soon after the robber fled the bank, local police arrive[d]. Officer Thomas Greene was the first to arrive. Once he learned the path the robber took, he directed other officers toward the cemetery about 50 yards from the bank. He followed soon thereafter. Based on experience, he knew of an access road about 20-25 yards inside the entrance gate to the cemetery. He found "some clothing" right in the center of that road about 25 yards from the cemetery's entrance. Those items were some pants and a sweat shirt. These items were "no more than 50 yards" from the bank.

Back at the bank, the investigation was ongoing. Officer Joe Osinski was summoned to photograph the scene and possibly collect evidence. Based upon the robber's path behind the counter, Osinski was able to develop a shoe print on the counter. It was from a Nike shoe. When done with these tasks, Osinski was directed to the cemetery. At the access road, "there were several pieces of clothing" "maybe a foot or two from each other." This collection included blue jeans, a hoody and a blue t-shirt.

At some point, Officer Osinski watched the bank's surveillance tapes. The jeans recovered from the cemetery access road were the same jeans worn by the robber. Most influential to him was the jeans, when he saw them on the road, they had the same cuff on the bottom as the jeans of the robber. He also identified the t-shirt recovered as "hanging out of the back of the gray hoody["] "from the surveillance photographs."

Five days after the robbery, [appellant] is at the McKeesport police station. Officer James Reed had [an] interaction with him. He takes [appellant's] shoes. They are made by Nike.

A few months later, in September 2013, Officer Reed and [appellant] are together again. Officer Reed got a "buccal swab for DNA sampling" purposes.

Officer Reed was also present at the preliminary hearing in the courtroom of the McKeesport magistrate judge. He was right next to Ms. Fenton in the courtroom awaiting the start of the hearing. Ms. Fenton saw quite a few defendants being escorted in and out of the courtroom. [Appellant] was one of those. He exited a holding area and passed Reed and said "What's up, Reed?" Reed's response was a head nod. Ms. Fenton's reply was more. She grabbed Reed's arm, and said, "That's him." His "height, the build and the way he looked" convinced Ms. Fenton that [appellant] was the robber.

Officer Reed also informed the Court that [appellant] lived on Pirl Street which is on the backside of the cemetery and many people use the cemetery as a short cut to get to and from the bank area of McKeesport to that area of Pirl Street.

Scientist Sara Bitner, from the Medical Examiner's Office of Allegheny County, also provided evidence against [appellant]. She examined the 3 items – blue t-shirt, blue jeans and gray hoody – found on the cemetery access road. She did a "tape lift" of areas where "epithelial cells" may be located on the clothing such as pockets of jeans and sleeves of the shirt. Her conclusion was [appellant] may have been a contributor to the shirt and jeans. Numerically, Ms. Bitner said the probability that [appellant] was the contributor on the blue shirt was "1 in 193,500" and for the blue jeans "it was 1 in 8,368".[Footnote 5][3]

---

[3] We set forth that portion of Sara Bitner's direct examination regarding her conclusions as to the scientific statistical probabilities that appellant was the contributor of DNA found on the blue shirt, the gray sweat jacket, and the blue jeans, as follows:

Q.    I'm going to start. Let's start with the tape lift from the blue shirt. Did you get any results from the tape lift from the blue shirt?

_____

A.     Yes.

Q.     And can you tell the Court what your results were in that particular case?

A.     One compared to the profile of [appellant]. [Appellant] could not be excluded as a possible contributor to the DNA mixture profile with statistics of 1 in 75,300 in the Caucasian population, 1 in 193,000 for the African-American population and 1 in 219,000 for the Hispanic population.

Q.     Did you also later perform DNA testing involving another person?

A.     Yes.

Q.     Who was that?

A.     Christopher Gaspersz.

Q.     And what was the result relative to DNA testing for the blue shirt with Mr. Gaspersz?

A.     No conclusions could be drawn concerning Mr. Gaspersz as a possible contributor to the mixture obtained.

Q.     What about the results from the tape lift from the gray sweat jacket, which I believe is Exhibit -- I believe it's 35.

A.     Due to the partial nature of the profile obtained, I was unable to draw conclusions for either [appellant] or Mr. Gaspersz.

Q.     What about the jeans, the tape lift from the interior pocket of the jeans or the hip pocket?

A.     For the hip pocket of the jeans, [appellant] could not be excluded as a possible contributor

to that mixture, but no conclusions could be drawn for Mr. Gaspersz.

Q.     Did your testing reveal as to how many possible contributors there were to these items?

A.     We estimated or I estimated in each of the items a minimum of three possible contributors for each of the items.

THE COURT:  If I understand this correctly, the shirt and the pants, [appellant] may have been a person that handled them, but given there are three contributors, you can't exclude -- you can't say definitively whether it's his DNA specifically, but you're giving a probability of 1 in 197,000, something to that effect for the shirt, but the sweatshirt you can't make any determination; and the pants would fall in that same category that possibly it could have been him because what you got -- his DNA would have been included within a broader sample of DNA that you retrieved from that item?

THE WITNESS:  That is correct, Your Honor.

THE COURT:  Okay.  Let's move on.

Q.     Were these conclusions reached to a reasonable degree of scientific certainty?

A.     Yes, they were.

THE COURT:  What was the statistic on the shirt and on the pants?

THE WITNESS:  For the shirt the statistic for the African-American population was 1 in 193,500.  For the pants it was 1 in 8,368.

THE COURT:  1 in 8,368?

[Footnote 5]  No DNA testing was done on the hooded jacket.

Joining the Commonwealth's science based presentation was Dr. Mark Perlin.  Perlin is the "chief scientist and executive officer at Cybergenetics". Cybergenetics "is a bio-information company that specializes in computer based interpretation of forensic DNA computer evidence.  In essence, through its computer based program, *True Allele*, Cybergenetics is able to take "complex DNA evidence" and separate "out the genetic types" which can then be "compared with the genetic type of other people in order to produce a DNA match statistic."  As clarified on cross-examination, Dr. Perlin does not do the "biological part" of the DNA testing, he does "the statistical analysis of the data to separate out the genotypes and the match statistic."  The underlying data Dr. Perlin used was obtained from Ms. Bitner.  Dr. Perlin's conclusions were that [appellant] and another individual had "contact with the pants" and only one person had "contact with the shirt."  Dr. Perlin quantified [appellant's] probability of being the only contributor to the blue shirt as "117 quintillion times more probable".  As for the blue jeans, Dr. Perlin pegged [appellant's] probability of being a contributor at "1.82 quadrillion".

The government closed its evidentiary presentation with expert Robert Levine.  Mr. Levine examined the Nike shoe taken from [appellant] and compared it to the photographs of the shoe print from the counter of the bank where the robber had stepped.  He was not able to say "the left shoe that was submitted was the shoe that made the shoeprint."

THE WITNESS:  That is correct.

Notes of testimony, 12/2/14 at 121-123.

Upon the government resting its case, [appellant] called one witness – Detective James Reed. After this robbery, [Detective] Reed interviewed the teller, Ms. Fenton. She told him that the person who did the May 15th robbery also robbed the bank 5 days later.

The Court then heard closing arguments from counsel. Its verdict was split – not guilty of all charges where Mr. Vasquez[4] was identified – and guilty of all other charges. A pre-sentence report was ordered and sentencing took place on February 23, 2015.

Trial court opinion, 1/12/16 at 2-5 (citations to notes of testimony and footnote 1 omitted).

Appellant raises the following issues for our review:

1.  Whether the trial court erred by denying [a]ppellant his fundamental rights of due process and a fair trial when it considered facts not offered or admitted into evidence in this matter, specifically including facts and testimony from a separate court proceeding relating to a separate robbery at the same bank for which [a]ppellant was acquitted by a jury?

2.  Whether the trial court erred by finding [a]ppellant guilty of two counts of robbery, one count of theft by unlawful taking, one count of terroristic threats, one count of simple assault, and one count of recklessly endangering

---

[4] We note that Dr. Levine was unable to effect a positive identification between the shoeprint and the shoes that were submitted for analysis because of the quality of the shoeprint lifted from the bank counter. He was, however, able to state that the left Nike shoe seized from appellant and the shoeprint he analyzed had the same combination of pattern elements and the same intersecting points where the different pattern elements intersect. (Notes of testimony, 12/2/14 at 170-171.)

another person because the evidence was insufficient to establish [a]ppellant as the person who committed the crimes beyond a reasonable doubt?

3. Whether the trial court's nonjury verdict finding [a]ppellant guilty of two counts of robbery, one count of theft by unlawful taking, one count of terroristic threats, one count of simple assault, and one count of recklessly endangering another person was against the weight of the evidence?

Appellant's brief at 7.

For ease of discussion, we will address appellant's challenges to the sufficiency and the weight of the evidence prior to addressing his claim that the trial court considered facts not offered or admitted into evidence.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of

the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Pappas*, 845 A.2d 829, 835-836 (Pa.Super. 2004) (citation omitted).

Appellant contends that the evidence was insufficient to prove that he committed the crimes because the "pretrial identification [by the bank teller] was impermissibly suggestive," and she "should have been precluded from making an in-court identification." (Appellant's brief at 28.) The gravamen of appellant's complaint, therefore, goes to the admission of this evidence, and not to its sufficiency.

Pennsylvania Rule of Evidence 103(a) provides that a party may claim error in the admission of evidence only if he, on the record, "makes a timely objection, motion to strike, or motion in *limine*," and "states the specific ground, unless it was apparent from the context[.]" Pa.R.E. 103(a)(1)(A)-(B). "We have long held that '[f]ailure to raise a contemporaneous objection to the evidence at trial waives that claim on appeal.'" *Commonwealth v. Tha*, 64 A.3d 704, 713 (Pa. Super. 2013) (citations omitted).

Here, the record reflects that appellant failed to file a pre-trial motion *in limine* to suppress the bank teller's identification testimony, failed to object during her testimony, and failed to move to strike after her testimony.

Therefore, appellant waives this issue on appeal. *See id.*

Appellant next complains that the verdict was against the weight of

the evidence.

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> . . . .
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> . . . .
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054-1055 (Pa. 2013) (citations,

quotation marks, and emphasis omitted). "In order for a defendant to

prevail on a challenge to the weight of the evidence, 'the evidence must be

so tenuous, vague and uncertain that the verdict shocks the conscience of

the court.'" ***Commonwealth v. Talbert***, 129 A.3d 536, 546 (Pa.Super. 2013).

Here, appellant complains that his conviction "shocks one's sense of justice" because the bank teller's identification of appellant was unreliable; the bank manager was unable to identify appellant; appellant never confessed; appellant's DNA was not found in the bank or on a sweat shirt found in the cemetery; appellant's fingerprints were not found at the bank; the DNA evidence should not be given significant weight because appellant lives by the cemetery; and the trial court did not properly weigh the DNA evidence found on the blue jeans. (Appellant's brief at 30-34.)

We decline appellant's invitation to assess the bank teller's credibility and reweigh the evidence, including what weight should be assigned to the scientific evidence. The trial court, as fact-finder, had the duty to determine the credibility of the testimony and evidence presented at trial. (***See id.***) Appellate courts cannot and do not substitute their judgment for that of the fact-finder. (***Id.***) Here, the trial court found the bank teller's testimony credible and further found that it was corroborated by the photographic evidence. The trial court also found the scientific evidence credible, including the overwhelming amount of DNA evidence. A careful review of the record supports our conclusion that the trial court did not abuse its discretion in denying appellant's weight of the evidence challenge. Therefore, this claim lacks merit.

We finally address appellant's claim that the trial court erred because it considered facts not offered or admitted into evidence, specifically "facts and circumstances of another robbery that occurred on May 20, 2013, for which [appellant] was acquitted."  (Appellant's brief at 23.)

The record reflects that prior to conducting the waiver trial that is the subject of this appeal, the trial court presided over a jury trial where appellant was acquitted of a separate bank robbery that occurred on May 20, 2013.   In that case, Christopher Gaspersz confessed to committing the May 20, 2013 robbery.

The record further reflects that although Mr. Gaspersz did not testify at the trial that is the subject of this appeal, he was mentioned during its course, and the issue of whether Mr. Gaspersz could have perpetrated the May 15, 2013 robbery was before the trial court sitting as fact-finder.  When a trial court sits as a fact-finder, it "is presumed to know the law, ignore prejudicial statements, and disregard inadmissible evidence." *Commonwealth v. Konias*, 136 A.3d 1014, 1021 (Pa.Super. 2016) (citation omitted).

In its opinion on this issue, the trial court stated:

> . . . The first reaction the Court has is that [appellant] is the one who injected the prior matter into this trial.   During cross-examination of Detective Reed, [appellant's] lawyer asked him

about Mr. Gaspersz' confession.[5]  So, [it is] a little hard for this Court to understand the current argument when it was [appellant] himself that brought this matter to the forefront.[Footnote 6]

> [Footnote 6]  [Appellant's] closing argument continued to push the argument and inference about the May 20th matter.  ("This is the second time we've been through this." [] "Again, based on previous testimony that you've heard . . . but the other case as well, Mr. Gaspersz [wore] his clothes." [] "Your Honor is privy to the testimony of

---

[5] In rendering the verdict in this case, the trial court provided further context to this issue, as follows:

> I believe when I look at the entirety of the circumstances -- and it is circumstantial in some respects, but the probability of [Fenton] having a visceral reaction she had to him when she saw him, for her having the description she gives of him, for his DNA to be on the blue shirt in the concentration it is with respect to the scans from the bank, with respect to the distance to his mom's house is almost a straight line, I believe that this issue about Gaspersz is a red herring.
>
> I believe Gaspersz is a flunky and a friend that would say anything he could say to extricate his buddy, [appellant], from his liability in robbing this bank.  And I think that that's a nonissue in this case, because he didn't testify here.
>
> I believe if anyone looks through that cheap doo-rag hanging over his face, it's clearly not Gaspersz who went in the bank.  The same person that went in the bank is the person that had on the same clothing that were [sic] found in the cemetery, and it's him.  He knows it.  I mean, I think we're playing games.  He knows he did it.

Notes of testimony, 12/2/14 at 198-199.

> Mr. Gaspersz where he admitted he robbed that bank three times.").
>
> That aside, this Court did what the law requires in such a situation – disregard material that it may know from other cases and judge guilt on what is properly before this Court. This was exemplified during closing argument and the Court's summation. The government began its speech with an objection about Mr. Gaspersz not testifying in this case. The Court's response was that it knows that. Implicit to all in the courtroom, by tone and tenor, is that the Court would not be considering that material. Later, the Court described the Gaspersz matter as a "red herring" and a "non-issue" in this case. The assertion that this Court erred by considering evidence of the prior robbery is simply lacking in support.

Trial court opinion, 1/12/16 at 6 (citations to notes of testimony omitted).

After a careful review of the record, we agree with the learned trial court that the record belies appellant's contention that the trial court considered evidence of the May 20, 2013 robbery. Therefore, this claim lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/31/2016

- 15 -