J-A02001-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JALEN DEMERE GIBSON :
:
Appellant : No. 1569 WDA 2018

Appeal from the Judgment of Sentence Entered August 8, 2018
In the Court of Common Pleas of Cambria County Criminal Division at
No(s): CP-11-CR-0001051-2017

BEFORE: SHOGAN, J., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.: FILED MARCH 30, 2020

Appellant, Jalen Demere Gibson, appeals from the August 8, 2018 judgment of sentence entered in the Cambria County Court of Common Pleas following his conviction by a jury of first-degree murder and related crimes. We affirm.

The facts of the crimes are as follows. On April 3, 2017, utilizing his girlfriend's white Chevrolet Malibu, Clifford Eddins ("Eddins") drove his half-brother, Dennis Manson ("Manson"), inter alia, to Harris Funeral Home (" the Funeral Home") in Johnstown, Pennsylvania. N.T., 8/3/18, at 80, 157–168. While en route, the brothers made a few stops, one of which was to the home of Eddins's friend, Travis Williams. Id. at 165. When they left Williams's home, Manson and Eddins were in the Malibu, and they followed Williams in his car. Id. at 166–167; N.T., 8/6/18, at 56. At some point, Manson and

Eddins left the Funeral Home, this time with Manson driving, to pick up Appellant at his home and return with him to the Funeral Home. N.T., 8/3/18, at 171–172; N.T., 8/6/18, at 20. On the way to Appellant's home, Manson turned in front of a motorcycle traveling toward them and "cut it off." N.T., 8/3/18, at 173; N.T., 8/6/18, at 23. Eddins testified "the man had his hands up like, yo, what the, you know what I mean, you just cut me off." N.T., 8/3/18, at 173; N.T., 8/6/18, at 23. Manson recognized the man and referred to him as "Tev," but Eddins did not know him. N.T., 8/3/18, at 173. The brothers proceeded to Appellant's house and picked up Appellant.

Manson, with Eddins in the front passenger seat, and Appellant in the rear passenger seat, returned to the Funeral Home. N.T., 8/3/18, at 173–174; N.T., 8/6/18, at 24–25. When they later left, Manson drove the Malibu, Eddins was the front seat passenger, and Appellant sat in the rear passenger seat. N.T., 8/3/18, at 179; N.T., 8/6/18, at 27–29. Eddins and Manson were going to "drop [Appellant] off at Pine Street." N.T., 8/3/18, at 179; N.T., 8/6/18, at 27–29.

Tevin Sitton ("Victim") was the man on the motorcycle. N.T., 8/3/18, at 180. Both Eddins and Manson testified that they saw Victim again. N.T., 8/3/18, at 180; N.T., 8/6/18, at 30–31. This time, Victim was accompanied by his two brothers, Million Smith ("Million") and Dwayne Sitton ("DJ"), who were all on separate motorcycles. N.T., 8/6/18, at 27–28. Eddins stated:

> My little brother [Manson] realize[d] who they are or whatever
> and made a comment like, he [Victim] probably don't [sic] even

know this was me in this car when I cut him off earlier when we were on our way . . . . He was like, I'm going to pull up and say it was me, like, my bad because he saw he had his hands up like that.

N.T., 8/3/18, at 181. Manson testified similarly:

I actually looked at [Eddins] like, oh shit, that's [Victim]. I said, you know, like if I see him later, I'm going to let him know that it was me that cut him off. I don't know what he could see. I know I cut him off. I didn't want him to think I did it on purpose or anything. It wasn't nothing [sic] serious, you know, it was just me taking a left.

N.T., 8/6/18, at 31–32.

Eddins testified that when they stopped at Victim's house, Victim came to the car, and Manson apologized for turning in front of him earlier that day. Id. at 183. Victim reached in the car and "gave [Manson] a handshake and gave me a handshake." Id. Unbeknownst to Eddins, Appellant had a gun and shot Victim "from the back seat of the window." Id. at 184.

Eddins testified that when the shots rang out, he "grabbed [his] head and ducked." N.T., 8/3/18, at 185. Manson drove off and Appellant stated, "[L]et me out." Id. at 186. Manson "pulled the car over and let him out." Id. The brothers then returned the Malibu to Eddins's girlfriend. Id. at 187.

Manson testified similarly that on their way to drop Appellant at his house, he saw Victim on Von Lunen Street, called him over to the car, and Victim walked "right to the window. N.T., 8/6/18, at 34. Manson told Victim, "[H]ey, that was me earlier, my bad. I cut you off. I didn't know if you knew that was me. He was like, oh. I don't even think he knew." Id. at 35. Manson

- 3 -

testified that Victim "reach[ed] over [Eddins] to give me a handshake. And then he also gave my brother a handshake." Id. As Manson turned back to drive, "[s]hots went off." Id. at 36–37. Manson did not know that Appellant had a gun. Id. at 67–68. Manson testified, "I actually thought somebody was shooting at us and they shot my brother, because my brother, he kind of like dropped like he was dead." Id. at 37. Manson stated his reaction was to "get out of there. So I pushed the gas, drove as fast as I could." Id. at 38. Appellant said, "Just let me out. Just let me out." Id. at 43. It was only then that Manson realized what had happened. Id.

Million testified that he, Victim, and DJ rode their motorcycles on April 3, 2017, and eventually stopped at Victim's house on Von Lunen Street. N.T., 8/3/18, at 28, 30. While they were outside, "a white Malibu pulled up." Id. at 30. Million recognized Eddins and Manson in the front seat and observed Victim talking with the men in the Malibu and shaking their hands. Id. at 32. Suddenly, shots rang out from the back seat where Appellant sat. Million recognized Appellant from the neighborhood. Id.

Elmo Smith ("Elmo"), Victim's and DJ's stepfather and Million's father, testified that he and his son and step-sons and other family members had gone to purchase a new motorcycle for Elmo that day. N.T., 8/3/18, at 57. They were unsuccessful in their purchase and returned to Victim's home on Von Lunen Street. Id. at 59. Elmo went to Bantly's, a nearby hardware store, when he heard shots ring out. Id. at 60. He testified that "[w]hen you come

out of Bantly's door, you can look straight down to Von Lunen." Id. at 61. As he ran out to his truck, he "noticed the white car go past." Id. The passenger side of the white car was the side he could see as the car passed, and he stated that he saw "Cliff [Eddins] in the passenger, front passenger's seat. I didn't—couldn't see the driver. And, then, in the back, I seen [Appellant] sitting up on the seat turning and looking behind him." Id. at 62. Elmo testified that he knew Appellant "since he was little." Id. At that point, Elmo saw Million and DJ running down the street, pointing at the white car. Id. at 63. Elmo stated, "I was going to try to follow them to see where they was [sic] going, but then I said, what's the use of me chasing them. I seen [sic] who it was, so I turned and went back to check on [Victim]." Id. at 64.

Detective Brad Christ of the Johnstown Police Department testified that he processed several hundred crime scenes in his ten years as a police officer and detective in Johnstown. N.T., 8/2/18, at 139–141. Detective Christ was the officer in charge of the murder scene. Id. at 142. Utilizing approximately thirty photographs that he took at the scene and that were admitted into evidence at trial, Detective Christ pointed out, inter alia, three surveillance cameras in the area. Id. at 146, 148, 156. Detective Christ also recovered a video surveillance box at the scene. Id. at 169. Specialists from the Pennsylvania State Police "exported the videos . . . that captured the crime . . . happening." Id. The videos were admitted into evidence and played for the jury. Id. at 171, 175. The videos showed Victim speaking with

people in a white vehicle when the back passenger window exploded with glass as a gun shot occurred. Id. at 176. Detective Christ also recovered a Harris brochure from the back seat of the white Malibu and a "shell casing headstamp Winchester .45 caliber, the same as the one located" on the ground where Victim was shot. Id. at 181. Victim was shot three times, and the cause of death was a "gunshot wound to the head with the manner of death being ruled a homicide." N.T., 8/2/18, at 77, 81. In all, the Commonwealth presented seventeen witnesses, including four members of Victim's family, and multiple eyewitnesses. Appellant presented no witnesses.

The trial court summarized the procedural history as follows:

Appellant was found guilty on August 7, 2018 of one count of First Degree Murder, two counts of Aggravated Assault, and three counts of Recklessly Endangering Another Person [("REAP")[1]] after a jury trial in this [c]ourt. Appellant was sentenced on October 2, 2018[,] on count 1 to life in prison without the possibility of parole and a consecutive aggregated period of not less than four (4) years and not more than eight (8) years at counts 10, 11, 12, and 13 involving other victims. Appellant filed his Notice of Appeal to the Superior Court on October 31, 2018[,] and was ordered to file his 1925 (b) Concise Statement within 21 days. This [c]ourt granted Appellant an extension to file the 1925 (b) Statement on two different occasions, with a new filing deadline of February 14, 2019.

Trial Court Opinion, 3/15/19, at 1–2. Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following questions on appeal:

I. Whether the trial court erred in making pre-trial and trial evidentiary rulings that violated Appellant's constitutional right to

_____

[1] 18 Pa.C.S. §§ 2501, 2702, and 2705, respectively.

present a complete defense and present an alternative theory to the jury:

> A. Whether the trial court erred by granting the Commonwealth's motion in limine and prohibiting the defense from introducing evidence that the decedent possessed drugs and guns that were found in his residence the day after the murder?

> B. Whether the trial court abused its discretion in prohibiting defense counsel from confronting Dennis Manson with photographs of Travis Williams, who looked like Appellant and was with the co-conspirators around the time of the murder, to prove that Travis Williams was the shooter?

Appellant's Brief at 1.

We address Appellant's claim that the trial court erred in granting the Commonwealth's motion in limine. When an appellant challenges the ruling on a motion in limine, our scope of review is limited to the relevant pretrial hearing transcripts. See In re Interest of L.J., 79 A.3d 1073, 1088-1089 (Pa. 2013) (noting that our scope of review is limited to the evidence presented at the pretrial hearing). In conducting our review, we apply an abuse-of-discretion standard. Commonwealth v. Moser, 999 A.2d 602, 605 (Pa. Super. 2010) (citation omitted). The admissibility of evidence is left to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous. Id. "The trial court will be reversed only if an error in the admission of evidence contributed to the

verdict." Commonwealth v. Sauers, 159 A.3d 1, 6 (Pa. Super. 2017) (citing Commonwealth v. Konias, 136 A.3d 1014, 1022 (Pa. Super. 2016)).

Before trial, the Commonwealth filed a motion in limine on April 9, 2018, seeking to preclude Appellant from presenting evidence that during the investigation, police executed a search warrant at Victim's residence and discovered marijuana and firearms. Motion in Limine, 4/9/18, at 1. The trial court held a hearing on April 17, 2018, after which it granted the Commonwealth's motion on April 19, 2018, and filed an opinion in support.

There was no testimony at the April 17, 2018 hearing regarding how much marijuana or the number of firearms found in Victim's home pursuant to the search conducted on April 4, 2018. N.T. (Motion in limine), 4/17/18, 2–3, 5. Appellant implied that because police found marijuana and drugs at Victim's home, Victim was a drug dealer and "could have had a number of people who wanted him [dead] for whatever reason related to the drugs." Id. at 4. As such, Appellant maintains "that any number of people could have killed" Victim. Appellant's Brief at 7. In particular, Appellant assails the following explanation by the trial court:

> On April 9, 2018, the Commonwealth filed a Motion in Limine to exclude testimony related to the search warrant executed by the Johnstown Police Department at [Victim's] residence in the immediate aftermath of the homicide. [The Commonwealth argued, and the court issued an opinion on April 19, 2018, in agreement, that the evidence seized, specifically narcotics and firearms, was not admissible.] At the hearing on this matter, Appellant argued that the evidence seized tended to show that [Victim] was engaged in the business of selling narcotics. Appellant argued that, because [Victim] was a drug dealer he was

- 8 -

potentially the subject of violent retaliations from various other unnamed individuals. Appellant believed that this evidence established that other unnamed individuals may have had a motive to kill [Victim].

Id. at 7 (citing Trial Court Opinion, 3/15/19, at 5–6).

Appellant contends the trial court's ruling prevented Appellant from introducing into evidence and offering testimony concerning the firearms and drugs seized at Victim's home following the shooting. Appellant's Brief at 7. Thus, he maintains the defense was prevented "from fully developing a defense theory and introducing relevant testimony of others with a potential motive to kill [Victim], especially in light of the fact that [Victim's] brother testified at the sentencing hearing that their father, Elmo Smith, was targeted in a shooting prior to the homicide." Id. at 7–8 (footnote omitted) (citing N.T. (Sentencing), 10/2/18, at 9–10). Appellant theorizes that Victim was a drug dealer and as such, would have many enemies with "a motive to kill" him. Appellant's Brief at 9.

This issue lacks merit. First, Appellant's reference to testimony at sentencing by Victim's father is of no moment because our review, as noted, is limited to the pretrial hearing transcript. Interest of L.J., 79 A.3d at 1088-1089. Second, there was no evidence presented that Victim was a drug dealer. N.T. (Motion in limine), 4/17/18, 2–6. Therefore, Appellant's argument is based on mere speculation. Third, the threshold inquiry with respect to the admission of evidence is whether the evidence is relevant. Commonwealth v. Blauser, 166 A.3d 428, 432 (Pa. Super. 2017); Pa.R.E.

402. Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence. Sauers, 159 A.3d at 6; Pa.R.E. 401. The fact that police found marijuana and firearms in Victim's residence the day after the homicide did not make it more probable or not that Appellant shot Victim or that Victim was a drug dealer, in the absence of an indication of the amount of marijuana. Finally, there was extensive evidence establishing that Appellant was the shooter. We agree with the trial court that "Appellant's purpose for attempting to introduce this evidence . . . to support the allegation that the victim was a drug dealer and thus may have been killed by an unnamed person is hypothetical and irrelevant." Trial Court Opinion, 3/15/19, at 7. Moreover, the evidence that Appellant was the shooter was overwhelming.

In his second issue, Appellant avers that the trial court erred in precluding Appellant's admission of photographs of Travis Williams, who he confusingly and mistakenly called Travis Washington. See, e.g., Appellant's Brief at 9–10. Appellant contends, "The photographs support his defense theory that another individual, Travis Williams, who looked like Appellant, was present in the back seat of the car, and shot [Victim]." Appellant's Brief at 10.

> We apply the following principles to an evidentiary challenge:
>
> In determining whether evidence should be admitted, the trial court must weigh the relevant and probative value of the evidence against the prejudicial impact of that evidence. Evidence is relevant if it logically tends to establish a material fact in the case

- 10 -

> or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.

Commonwealth v. Vucich, 194 A.3d 1103, 1106 (Pa. Super. 2018), appeal denied, 199 A.3d 885 (Pa. 2018).

After review, we conclude that this issue is waived. Appellant's argument in his appellate brief completely lacks any references to the record or trial testimony, and therefore, is deficient. Commonwealth v. Samuel, 102 A.3d 1001, 1005 (Pa. Super. 2014) ("The Rules of Appellate Procedure require that appellants adequately develop each issue raised with discussion of pertinent facts and pertinent authority."). See Pa.R.A.P. 2119. Appellant avers that he attempted to admit photographs of "Travis Washington[, sic] who was with Clifford Eddins and Dennis Manson, prior to and following the shooting death of [Victim]. The photographs of Williams fit the exact physical description and characteristics of Appellant." Appellant's Brief at 9–10.

First, the notes of testimony lack any reference to someone named "Travis Washington." Second, Appellant wholly fails to refer to the notes of testimony in his argument on this issue. Appellant's Brief at 9–12. "It is not this Court's responsibility to comb through the record seeking the factual underpinnings of an appellant's claim." Samuel, 102 A.3d at 1005. It is not this Court's responsibility to develop an argument for an appellant or scour the record to find evidence to support an argument. Commonwealth v.

Cannavo, 199 A.3d 1282, 1289 (Pa. Super. 2018).   In his brief, Appellant failed to direct our attention to the place in the record where he attempted to admit the photographs, cite to where he lodged a timely and specific objection, or point out where the trial court ruled on the admission at trial.   Accordingly, we conclude that this issue is waived.

Even if not waived, we would affirm the issue on the basis of the trial court's explanation, as follows:

> While counsel for Appellant was cross-examining Dennis Manson, the Commonwealth's last witness, counsel attempted to introduce two photographs of an individual identified as Travis Williams.[1]  The Commonwealth objected to the introduction of the photographs and this [c]ourt sustained the objection.  Pursuant to Pennsylvania Rule of Evidence 401, "evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action."  Pa.R.E. 401.  It is a determination to be made by the [c]ourt whether evidence has a tendency to make a fact more or less probable.  "Evidence is considered relevant if it logically tends to establish a material fact in the case, tends to make the fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact."  Commonwealth v. LaCava, 666 A.2d 221, 227 (Pa. 1995).

> > [1] This [c]ourt viewed Counsel's decision to wait until the Commonwealth's very last witness to bring this evidence forward as more of an unfair trial tactic than an attempt to present the jury with an alternative suspect as the shooter in this case.

> At trial, three separate witnesses identified the shooter as the Appellant, Jalen Gibson.  First, William Harris testified during the jury trial that he is the owner of the Harris Funeral Home that the two co-defendants testified that they were at with the Appellant on the day of the shooting.  Harris testified that he has video surveillance in multiple places at the funeral home. Transcript of Jury Trial, 08/03/18, p. 13, 11. 9-13.  Harris also

testified that one of the cameras located in the vestibule shows the main entrance and who is in that vestibule. Transcript of Jury Trial, 08/03/18, p. 14, ll 11-23. Clifford Eddins, co-defendant in this case, testified for the Commonwealth as an identification witness and after viewing the video surveillance from the Harris Funeral Home, identified himself, Appellant and his brother, Dennis Manson all leaving the Harris Funeral Home together on the date of the incident. Transcript of Jury Trial, 08/03/18, p. 176, ll 5-25. Also during the jury trial, Dennis Manson was shown the video surveillance from the Harris Funeral Home. After viewing that video, Mr. Manson also identified his brother Clifford, Appellant and him all leaving the funeral home. Transcript of Jury Trial, 08/06/18, p. 27, ll. 4-21. Mr. Manson further testified that Appellant got into the car with him and his brother, Clifford Eddins as they left the funeral home. Transcript of Jury Trial, 08/06/18, p. 28, ll. 14-24. Throughout the course of the trial, no attempt was made to cross examine the prior identification witnesses on the issue that the shooter may have been a man identified as Travis Williams, the man in the photographs that the Appellant attempted to introduce into evidence.

Alternatively, even if Counsel believes this evidence is relevant, "the [c]ourt may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Three other witnesses, Million Smith, Elmo Smith and Clifford Eddins all testified and identified the Appellant prior to Dennis Manson's testimony, when Appellant attempted to introduce the photographs. The Commonwealth would have been prejudiced by the inability to rebut this misidentification evidence as Dennis Manson was its last witness and the other identification witnesses listed above had already testified. Further, those same witnesses were no longer being sequestered, so the Appellant would have had an advantage by waiting until the last Commonwealth witness to introduce this evidence, and could claim that the prior identification witnesses knew what to say if recalled by being in the courtroom and hearing Manson's testimony. Therefore, the [c]ourt properly disallowed this evidence, as it otherwise would have substantially and unfairly prejudiced the Commonwealth.

Trial Court Opinion, 3/15/19, at 3–5. Moreover, Appellant has not advanced a plausible basis for relevance of a photograph of Travis Williams in light of the significant eyewitness testimony that was corroborated by the surveillance videos played at trial. Therefore, even if the trial court erred in its ruling, any prejudice was de minimis and any error was harmless. Vucich, 194 A.3d at 1110 (introduction of irrelevant photographs was improper, but their prejudicial effect was de minimis). Thus, even if not waived, the issue lacks merit.

Judgment of sentence affirmed.

P.J.E. Ford Elliott joins this Memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/30/2020