J-S04001-16

2016 PA Super 68

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KENNETH JOHN KONIAS, JR., | |
| Appellant | No. 881 WDA 2014 |

Appeal from the Judgment of Sentence February 18, 2014
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0007539-2012

BEFORE:  BOWES, OLSON, and STRASSBURGER,* JJ.

OPINION BY BOWES, J.:                           **FILED MARCH 18, 2016**

Kenneth John Konias, Jr. appeals from the judgment of sentence of life imprisonment for first-degree murder, and a consecutive sentence of ten to twenty years imprisonment for robbery, imposed on February 18, 2014, after a nonjury trial. We affirm.

Appellant's convictions arose from an incident on February 28, 2012, when Michael Haines died as a result of a gunshot wound to the back of the head.  Appellant admitted to shooting Mr. Haines, but maintained he acted in self-defense. The Commonwealth's evidence in support of Appellant's convictions was as follows.  In February 2012, Appellant was employed as an armored truck driver for Garda Cash Logistics ("Garda").  On February 28, 2012, Appellant was assigned to work with the victim, Michael Haines, an

_____

* Retired Senior Judge assigned to the Superior Court.

individual with whom he had never worked prior to that day. The two men were assigned to Truck 5678, and responsible for a route that included stops at Rivers Casino, the Ross Park Mall Home Depot, and JC Penney, among other locations.

Truck 5678 was separated into three compartments. Located at the front of the truck was a driver's area. This area was accessible only from the exterior driver-side door. The driver's area was composed of one seat and a waist-high flat area extending to the right-hand side of the truck, so there was no passenger seat. Directly behind the driver's seat, a sliding door separated the driver's area from the hopper, the intermediate area of the truck. A portion of the door, which slid open to rest behind the driver, extended approximately four inches into the doorway.

The hopper area, where the victim was seated, contained one chair located on the right-hand side of the vehicle. Adjacent to the hopper chair, another waist-high flat area extended to the left side of the truck. Numerous United States postal bins, which Garda utilized to separate various items within the truck, were upright and neatly organized on top of this flat area. The hopper area was accessible only from the exterior via a door on the right side of the vehicle. The final truck compartment, which was the storage area, was separated from the hopper area by a metal fence. That area could only be accessed from the rear doors on the truck.

On the day in question, Appellant and Mr. Haines arrived early at each stop along their assigned route. Appellant and the victim collected and scanned bags of money, printing out a receipt for each customer directly from the scanner. The hand-held scanner employed by Appellant and the victim hung in a charger located on the wall of the hopper area of the truck. On this particular day, after scanning each bag, Appellant placed the bags of money in the hopper area of the truck rather than in the rear storage area, as was customary.

Following the pick-up at the Ross Park Mall Home Depot, Appellant's truck pulled to a stop and parked in the lot for approximately three minutes. During this time, Appellant shot the victim in the back of the head at close range with a .9 millimeter handgun. Shortly thereafter, the truck exited the parking lot, traveling toward McKnight Road. Surveillance cameras stationed along McKnight Road recorded Appellant's truck driving towards downtown Pittsburgh.

Appellant drove the truck toward Garda's headquarters, parking it under the Thirty-First Street Bridge with the victim's body still facing the rear of the truck in the step-down portion of the hopper area. Appellant traveled by foot to the Garda parking lot, retrieved his personal vehicle, and returned to the truck. Upon returning, Appellant loaded his personal vehicle with $2,323,252 from the hopper area of the truck. He placed paper towels in the step-down area of the hopper to soak up the victim's blood, activated

the vehicle's four-way flashers, left the engine running, and locked the truck before fleeing the scene. The truck was eventually located by a Garda employee around 4:30 p.m., and thereafter, Pittsburgh Police Detective Ryan Rable arrived at the scene.

Upon his arrival, Detective Rable met with several Garda employees. He and Detective Margaret Sherwood, together with several other officers, inspected the vehicle. Mr. Haines was deceased by the time the truck was discovered by Garda employees. Furthermore, U.S. postal bins situated inside the hopper area were upright, exhibiting no signs of damage.[1] In addition, the victim was found with his uniform shirt tucked in and buttoned. Finally, his identification badge was still in its plastic holder, clipped to his left pocket, and attached to a breakaway cloth lanyard.

An examination by the forensic biologist found no tears or separations on the victim's shirt. The victim's pants also showed no signs of tearing or separation. An examination by the forensic pathologist noted the cause of the victim's death was a single gunshot wound to the back of the head. The victim sustained no further injuries, abrasions, bruises, or scratches. No signs of a struggle were observed inside the truck.

_____

[1] Testimony makes clear that, during transport of the truck to a nearby garage, a single postal bin situated upon the hopper chair tipped, causing items to fall onto the victim.

Following his flight from the truck, Appellant returned home, removed his blood-stained, Garda-issued jacket containing a .9 millimeter shell casing, showered, and stashed portions of the money stolen from the truck at various locations in and around the Pittsburgh area for his friends and family to recover. Specifically, Appellant left $24,000 in a bag at his grandmother's gravesite, $252,000 in a bag under his father's vehicle, and $10,000 in a work boot located on the porch of a friend's residence.[2] Appellant then stole a license plate to replace the plate on his personal vehicle, and discarded his cellular telephone along Route 51. Appellant absconded to Florida with the remaining money stolen from the Garda truck.

Appellant was apprehended in Florida on April 24, 2013. At the time of his arrest, Appellant possessed four forms of fraudulent identification, and a stolen credit card. A search of his Florida residence revealed a loaded .9 millimeter firearm, as well as the victim's firearm, which was taken at the time of his death. Subsequent investigation revealed that Appellant sought aid in attempting to flee to Haiti.

Appellant retained private counsel. On August 15 and October 9, 2013, he filed motions seeking funding for a forensic expert, clothing analysis, and a forensic psychologist. The August 15, 2013 motion asserts, "Although [Appellant]'s family members have retained within counsel for the

---

[2] Officers ultimately recovered this portion of the money.

purposes of representation at trial, [Appellant] is now indigent and cannot afford the costs of retaining a privately retained forensic expert for the areas of ballistic fire arms, clothing analysis, and forensic psychology."  Motion To Appoint Forensic Experts in Ballistic Firearms, Clothing Analysis and Mental Health Behavioral Forensic Psychologist, 8/15/13, ¶ 11.

On October 9, 2013, Appellant again requested funding, stating, "Although [Appellant]'s family members have retained within counsel for the purposes of representation at trial, [Appellant] is now indigent, and so is his family, and cannot afford the costs of retaining a privately retained psychological expert."  Motion to Approve the Payment of Expert Fees for a Behavioral Forensic Psychologist By Allegheny County, 10/9/13, ¶ 5. Neither motion contained information regarding Appellant's income, expenses, liabilities, or other financial information necessary to aid the court's determination of his financial status.  In addition, the motions were not accompanied by any affidavits averring Appellant's inability to pay for the requested experts.  The motions were denied by orders dated August 20 and October 10, 2013, respectively.

A nonjury trial commenced on November 6, 2013 and concluded in a conviction.  The trial court rejected Appellant's position that he acted in self-defense during a struggle with the victim.  Following his conviction, Appellant's counsel sought to withdraw.  The court granted this motion, and a public defender was appointed by court order on December 18, 2013.  On

February 18, 2014, the court imposed the mandatory sentence of life imprisonment without parole for first-degree murder, as well as, a consecutive term of ten to twenty years for robbery. Timely post-sentence motions were denied. This appeal followed. Appellant raises the following issues for this Court's consideration:

I.    Did the Court err in failing to provide expert funding, or even to conduct a hearing on the need for funding, where the defense made two separate requests for experts to counter Commonwealth evidence and each request was supported by allegations of indigency?

II.   Did the Court err in permitting a Detective to testify to the ultimate issue, namely whether a struggle had ensued before the shooting, where her testimony was speculative and based on facts outside her personal knowledge?

III.  Was the verdict rendered contrary to the weight of the evidence where, when viewed in its entirety, the evidence was not consistent with first degree murder?

Appellant's brief at 4.

Appellant first contends that the trial court erred in denying without a hearing his request for public funds to hire experts to assist in his defense. It is well-established that indigent defendants have a right to access the same resources as non-indigent defendants in criminal proceedings. *Commonwealth v. Curnutte*, 871 A.2d 839, 842 (Pa.Super. 2005). The state has an "affirmative duty to furnish indigent defendants the same protections accorded those financially able to obtain them." *Commonwealth v. Sweeney*, 533 A.2d 473, 480 (Pa.Super. 1987).

Procedural due process guarantees that a defendant has the right to present competent evidence in his defense, and the state must ensure that an indigent defendant has fair opportunity to present his defense. *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985).

However, "[t]he provision of public funds to hire experts to assist in the defense against criminal charges is a decision vested in the sound discretion of the court and a denial thereof will not be reversed absent an abuse of that discretion." *Commonwealth v. Cannon*, 954 A.2d 1222, 1226 (Pa.Super. 2008) (citations omitted). Appellant argues it was an abuse of discretion to deny his motions without a hearing to establish the need for experts and Appellant's inability to pay. He asserts that the mere fact that a defendant has retained private counsel does not automatically indicate all other costs and fees associated with the defense can be met.

In sole support of his position, Appellant points to the statements contained within the August 15, 2013 and October 13, 2013 motions requesting funding from the court. Appellant characterizes the statements as averring that "all funds have been used by counsel, that the client and his family have exhausted their financial means, that the defendant was incarcerated, indigent, and therefore in need of the court to grant funding for necessary experts to dispute the Commonwealth's evidence, and to investigate the mental health and faculties of [Appellant]." Appellant's Brief at 23-24.

In light of these statements, Appellant argues, the failure to conduct a hearing in which counsel could explain the need for funding denied him his right to present a full and fair defense. Furthermore, Appellant asserts, without citation to authority, that "denying a defendant funding to explore potential defenses or evaluate mental health is a denial of due process." Appellant's brief at 26.

This Court has not established factors a trial court must consider in exercising its discretion when making a determination of indigency for the purpose of appointing an expert. However, as we did in *Cannon*, we look for guidance to principles established for assessing indigency in determining whether a party may proceed *in forma pauperis*, or is entitled to the appointment of counsel. *Cannon*, *supra* at 1226.

In *Cannon*, we noted a party seeking to proceed *in forma pauperis* is "required to file a petition and an affidavit describing in detail the inability to pay the costs of litigation," including the information from the applicant regarding, "present or past salary and wages, other types of income within the preceding year, other contributions for household support, property owned, available assets, debts and obligations, and persons dependent for support." *Id.* Following the filing of this affidavit, the trial court must "satisfy itself of the truth of the averment of an inability to pay the costs of litigation." *Id.* A trial court, in exercising its discretion in determining whether a defendant is indigent for the purposes of *in forma pauperis*, "must

**focus on whether the person can afford to pay** and cannot reject allegations in an application without conducting a hearing." **Id***.* (emphasis added, citations omitted).

Similarly in **Cannon**, we looked to principles elucidated by our Supreme Court as to what constitutes indigency in relation to a defendant's request for the appointment of counsel. The Supreme Court opined, "[a]mong other factors that may be relevant to a defendant's financial ability to hire private counsel are the probable cost of representation for the crime charged and **the defendant's liabilities**." **Id***.* at 1226-27 (emphasis added, citations omitted).

The framework we developed in **Cannon**, **supra**, presumes a trial court, in determining whether a defendant is indigent and entitled to the benefit of public funding, has accurate information regarding the financial status of the applicant from which it may exercise its discretion. It therefore follows that, only after the defendant has provided some reliable information as to his inability to pay, is the trial court "bound to satisfy itself of the truth of the averments of an inability to pay" by conducting a hearing. **Id***.*

We observe, "[t]he Commonwealth is not obligated to pay for the services of an expert simply because a defendant requests one." **Curnutte**, **supra** at 842. We agree with Appellant that merely retaining private counsel does not, in itself, establish he was not indigent. However, Appellant's failure to supply the trial court with, at a minimum, any financial

information substantiating his inability to pay, is fatal to his argument. A mere averment of indigency and inability to pay is not sufficient to trigger the necessity for a hearing under **Cannon**. The defendant must make some specific showing of a financial hardship for the court to afford relief.

Therefore, we find the trial court did not abuse its discretion in denying Appellant's motions where Appellant failed to provide at least a modicum of financial information within his motions. Any financial information Appellant wished to produce at a hearing was available at the time of filing of those motions, and inclusion of that information, at a minimum, is necessary to enable judicial consideration of whether a hearing is necessary to determine the truth of those averments. This contention fails.

Appellant next contends the trial court erred in permitting Detective Sherwood to testify, over defense objection, as to whether a struggle occurred in the Garda truck, or whether anyone may have altered the interior of the truck prior to investigation. Appellant's brief at 34. Citing Pennsylvania Rules of Evidence 701[3] and 702,[4] concerning lay and expert

_____

[3] Pa.R.E. § 701 states, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and, (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

[4] Pa.R.E. § 702 states, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of
*(Footnote Continued Next Page)*

- 11 -

testimony, respectively, Appellant argues Detective Sherwood was permitted to present prejudicial opinion testimony concerning the crime scene, although she was not offered as an expert witness.

A review of the record reveals the following exchange: "Q: Now, with respect to your observations was there anything that would lead you to believe that there was struggle or a violent confrontation or any confrontation inside that –. A: No." N.T. Trial, 11/6/13, at 50. Defense counsel objected to this testimony on the grounds of speculation, arguing the witness could not testify beyond her personal observations as to what occurred before she arrived on the scene. The court implicitly sustained the objection by instructing the prosecutor to rephrase his question, which he did. "Q: With respect to the bins and the items there did you locate anything that had fallen out of a bin? A: No, and in answer to [defense counsel]'s objection I can say definitively that nobody else was inside the hopper area of that truck." *Id*. at 50-51.

After the witness's unprompted response, defense counsel did not object, made no objection or motion to strike on any basis. "In order to

---
*(Footnote Continued)* ⸻

an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson; (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and, (c) the expert's methodology is generally accepted in the relevant field."

preserve an issue for review, a party must make a timely and specific objection at trial." **Commonwealth v. Stokes**¸ 78 A.3d 644, 653 (Pa.Super. 2013) citing **Commonwealth v. Griffin**, 684 A.2d 589, 595 (Pa.Super. 1996). Moreover, "[a] party complaining, on appeal, of the admission of evidence in the court below will be confined to the specific objection there made." **Commonwealth v. Bedford**, 50 A.3d 707, 713 (Pa.Super. 2012) (citation omitted).

Defense counsel initially objected to Detective Sherwood's answer. However, after the trial court required the prosecutor to rephrase the question, which he did, defense counsel made no further objection. Nor did he move to strike Detective Sherwood's statements from the record when she volunteered evidence that had been the subject of an objection that was sustained. We find defense counsel's failure to object to Detective Sherwood's statements constitutes a waiver of the issue. **Stokes**, **supra**.

Assuming, *arguendo*, the issue was properly before us, the trial court, sitting as the trier of fact, "is presumed to know the law, ignore prejudicial statements, and disregard inadmissible evidence." **Commonwealth v. Smith**, 97 A.3d 782, 788 (Pa.Super. 2014). Furthermore, in order to constitute reversible error, an error in the admission of evidence must have contributed to the verdict. "An error may be considered harmless only when the Commonwealth proves beyond a reasonable doubt that the error could not have contributed to the verdict." **Commonwealth v. Brooker**, 103

A.3d 325, 332 (Pa. Super. 2014) (citations omitted). Moreover, "this burden is satisfied when the Commonwealth is able to show," *inter alia*, "the error did not prejudice the defendant or the prejudice was *de minimis*." ***Id.***

Here, Detective Sherwood was only one of the experienced investigative officers and experts who testified to the orderly appearance of the hopper area of the truck, and the lack of any signs of an altercation between Appellant and the victim. In addition to testimony from various officers as to the condition of the interior of the truck, the trial court, in rejecting self-defense, also relied on reports from the forensic biologist and forensic pathologist indicating neither the victim's clothing nor other injuries on his body indicated evidence of a struggle. In light of the presumption that the trial court ignored and disregarded Detective Sherwood's statement as well as other evidence confirming no altercation occurred, we find the admission of Detective Sherwood's statement to be harmless.

Appellant's final contention is that the trial court committed an abuse of discretion when it rejected his weight-of-the-evidence challenge. Appellant argues his first-degree murder conviction was contrary to the weight of the evidence because the testimony and evidence was more consistent with justifiable self-defense.

When we review a weight-of-the-evidence challenge, we do not actually examine the underlying question; instead, we examine the trial court's exercise of discretion in resolving the challenge. ***Commonwealth v.***

***Leatherby***, 116 A.3d 73, 82 (Pa.Super. 2015). This type of review is necessitated by the fact that the trial judge heard and saw the evidence presented. ***Id***. Simply put, "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." ***Id***. A new trial is warranted in this context only when the verdict is "so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Commonwealth v. Morales***, 91 A.3d 80, 91 (Pa. 2014).

Of equal importance is the precept that, "The finder of fact. . . exclusively weighs the evidence, assesses the credibility of witnesses, and may choose to believe all, part, or none of the evidence. ***Commonwealth v. Sanchez***, 36 A.3d 24, 39 (Pa. 2011) (citation omitted) ***see also Commonwealth v. Page***, 59 A.3d 1118, 1130 (Pa.Super. 2013) ("A determination of credibility lies solely within the province of the factfinder."); ***Commonwealth v. Blackham***, 909 A.2d 315, 320 (Pa.Super. 2006) ("It is not for this Court to overturn the credibility determinations of the fact-finder.").

Here, the trial court found no evidence presented as to the defendant's purported fear for his own safety, state of mind, nor any evidence of a struggle between Appellant and the victim giving rise to a reasonable belief

in imminent danger of death or serious bodily harm. Rather, the trial court found the interior of the narrow and confined spaces within the Garda truck showed no signs of a struggle having occurred, postal bins were upright and unbroken, the victim's shirt remained tucked in and untorn, and the victim's identification badge remained clasped to his left-pocket and attached to a breakaway cloth lanyard.

Furthermore, the trial court found no evidence from which one could infer that it was necessary for Appellant to use deadly force to repel an attack being perpetrated upon him by the victim. Instead, the trial court credited the testimony, and was persuaded by evidence, indicating that the victim died from a fatal gunshot wound to the back of the head. The trial court noted that Mr. Haines suffered no other injuries, abrasions, bruises, or scratches consistent with a struggle.

Therefore, upon review of the record, we agree with the trial court that it was well within its right as the ultimate fact finder to weigh the evidence in such a manner. We can discern no abuse of discretion on the part of the trial court in concluding the verdict was not against the weight of the evidence.

Based on the foregoing discussion, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/18/2016