J-A22044-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| DARREL EUGENE HARDY, JR. | : | |
| | : | |
| Appellant | : | No. 1353 WDA 2022 |

Appeal from the Judgment of Sentence Entered June 30, 2022
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0010888-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| DARREL EUGENE HARDY, JR. | : | |
| | : | |
| Appellant | : | No. 1354 WDA 2022 |

Appeal from the Judgment of Sentence Entered June 30, 2022
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0010887-2018

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: May 29, 2024**

Appellant, Darrel Eugene Hardy, Jr., appeals from the judgment of sentence entered in the Allegheny County Court of Common Pleas, following his jury trial convictions for first degree murder, firearms not to be carried without a license, and tampering with evidence at docket No. 0887, and arson,

reckless burning, and criminal mischief at docket No. 0888.[1]  We affirm.

The trial court set forth the relevant facts of this case as follows:

> This matter arises out the murder of Zachary Moore in the early morning hours of July 8, 2018.  At trial the Commonwealth established that at approximately 5:31 a.m. on July 8 police received a report of a man lying along the southbound side of East Pittsburgh McKeesport Boulevard in North Versailles.  The responding officer found Moore's body with a gunshot wound to the head and the body was still warm.  (N.T. Trial, 3/21-30/22, at 104).  Allegheny County Police homicide detectives also responded to the scene and based on their observation of fresh blood on the roadway and around the body, it was believed that Moore was shot at another location and then dumped from a vehicle on the side of the road.  Further, finding that the back of Moore's shirt was also soaked in blood, it was believed that he may have been shot while in a seated position.  (***Id.*** at 133-134).  Based on the evidence that Moore may have been seated in a vehicle when he was shot, it was believed that the vehicle could be "messy or contain lots of biological evidence" and that sometimes the perpetrators try to destroy the evidence.  (***Id.*** at 137).  As a result, the Allegheny County 911 Center was contacted to determine if there were any reported car fires in Allegheny County that morning and a car fire was reported on the South Side slopes in the City of Pittsburgh at approximately 6:25 a.m. that morning.  (***Id.***)  Further, review of the license plate reader system near the body showed a vehicle with a Maryland license plate, 7CK-9170, traveling north on East Pittsburgh McKeesport Blvd at 4:51 a.m.  (***Id.*** at 139).  In addition, video from cameras at a nearby restaurant showed the vehicle making a U-turn and then proceeding southbound, the side of the road where the body was located.  (***Id.*** at 140).  This license plate matched the license plate of the car that was reported on fire on the South Side of Pittsburgh.  Detectives traced the license plate to Hertz Rental Car which identified the vehicle as a Chevy Malibu that was rented to [Appellant].  (***Id.*** at 141-142).

---

[1] 18 Pa.C.S.A. §§ 2502(a); 6106(a)(1); 4910(1); 3301(a)(1)(i); 3301(d)(2); and 3304(a)(1), respectively.

Based on the information that [Appellant] had rented the vehicle, Allegheny Police detectives located an address for [Appellant] at 839 Sleepy Hollow Road in Castle Shannon and at approximately 2:00 p.m. on July 8 went to the location to speak to [Appellant] about his rental car. They were accompanied by two uniformed police officer[s] so they could readily be identified as law enforcement and for their safety, as they had determined that [Appellant] was the registered owner of a firearm. (**Id.** at 214-215). [Appellant spoke with the detectives in his home thereafter].

(Trial Court Opinion, filed 3/23/23, at 2-3) (record citation formatting provided; footnote omitted).

Police arrested Appellant in connection with the murder that day. At docket No. 0887, the Commonwealth charged Appellant with criminal homicide, firearms not to be carried without a license, and tampering with physical evidence. At docket No. 0888, the Commonwealth charged Appellant with arson, recklessly burning/exploding, risking catastrophe, and criminal mischief. On October 29, 2019, Appellant filed a motion to suppress statements he made to detectives in his home, arguing that the statements were obtained as a result of an unlawful custodial interrogation. After a hearing which commenced on December 10, 2019, and was continued until February 12, 2020, the court denied the motion to suppress, finding that under the totality of the circumstances, the questioning of Appellant in his home did not constitute the functional equivalent of an arrest.

The case proceeded to trial; however, on March 21, 2022, at the time set for jury selection, Appellant's counsel informed the court that Appellant

wanted to present a *pro se habeas corpus* petition and would not proceed with jury selection. Appellant requested that the court appoint new counsel to argue the petition, and the court denied his request, instructing Appellant and counsel to proceed with jury selection. After Appellant refused to participate, the court informed him that although he could choose not to be there, jury selection would continue. Appellant did not participate in the initial jury selection; however, after eight jurors were selected, he chose to participate in the remainder of the process.

After the jury was selected, the case proceeded to trial. The trial court summarized the evidence presented as follows:

> [The Commonwealth introduced the testimony of the detectives who arrived at Appellant's house on the day of the murder.] During the interview, the detectives told Appellant they wanted to talk to him about his car. [Appellant] told them that he had recently rented the car because his car was wrecked. He told them that he was a jitney driver and he picked Moore up in Homestead and they drove to the Homeville Trolley Stop, a bar in Homestead, as well as two clubs in the Strip District, [Preeti's Pitt], and the XO Club. [Appellant] also told the officers that they stayed at the Trolley Stop until about 12:00 a.m. They then went to [Preeti's Pitt] until about 2:30 a.m. and then to the XO Club, which closed at 4:00 a.m. [Appellant] stated that the clubs had video cameras and the officers would be able to see that they were at each of the clubs. [Appellant] stated that when they left the XO Club, Moore drove him home because [Appellant] "was drunk as hell" and they were accompanied by a friend of Moore's, who [he] described as being tall with dreads.
>
> [Appellant] stated Moore dropped him off at his home at 4:30 a.m. and he let Moore take the car to drive home. [Appellant] stated that he never left his home after that and [Appellant's] girlfriend, Ashley Guinyard, who was present

- 4 -

when [Appellant] was talking to the detectives, also stated that she was there when [Appellant] came home at 4:30 a.m. and they never left.

During their review of the videos from the clubs, the detectives identified the other person with [Appellant] and Moore as Christian Mahone. Mahone testified at trial that he was friends with Moore for about eight years and knew [Appellant] only as Moore's "driver," who he met about two months before the murder. (N.T. Trial, at 179-180). Mahone testified that he saw Moore and [Appellant] at the Homeville Trolley Stop when he arrived between 10:00 to 11:00 p.m. (*Id.* at 184). He stated that during the night, Moore was flashing "a lot of money" and Moore told him that he had $7,000. (*Id.* at 187-188). Mahone testified that Moore wanted to go to [Preeti's Pitt] and Moore, [Appellant] and others went to [Preeti's Pitt] and he went to a different club in Homestead to eat. Video showed them leaving the Trolley Stop at 11:55 p.m. and they agreed to meet at the XO Club. (*Id.* at 191). At that time, [Appellant] was driving a red Malibu. Mahone testified that he then met Moore and [Appellant] at the XO Club at approximately 2:00 a.m. They then left the XO Club at approximately 3:30 a.m. because they wanted to go to a fourth club, Secrets, which was located in Homewood, and they wanted to arrive before 4:00 a.m. Mahone testified that [Appellant] and Moore rode him to his car and they drove separately to Secrets. When Mahone arrived at Secrets, Moore was standing outside of the car urinating and [Appellant] was sitting in the driver's seat. (*Id.* at 200). It was approximately 4:00 a.m. and they were denied admission to Secrets and then Mahone talked with Moore briefly and then left. He testified that at that time Moore appeared inebriated and wasn't fit to drive but [Appellant] did not appear drunk. (*Id.* at 201-202).

During the investigation, the detectives also obtained various video surveillance which was presented at trial. This included video that showed [Appellant] driving his rental car at the intersection of Library Road and Grove Road in Castle Shannon at 5:54 a.m. on July 8; video from an autobody shop located at 2116 South 18th Street, in the vicinity of the car fire on the South Side of Pittsburgh at 6:25 a.m. on July 8 which showed [Appellant] walking on the street along the side of the autobody shop; (*id.* at 149); video of

[Appellant] on a Port Authority bus at approximately 6:28 a.m. traveling from South 18th Street toward Carson Street; and, video at the T Station entering a trolley at approximately 6:43 a.m. and exiting the trolley at the Castle Shannon stop at approximately 6:58 a.m. (*Id.* at 458-468).

Evidence was also presented of dates, times and photos from the License Plate Reader system located in various parts of Allegheny County which included photos of [Appellant's] rental vehicle on 1-376 at the Squirrel Hill Tunnel at 5:03 a.m. on July 8.

The Commonwealth presented the testimony of John Orlando, a Special Agent for the FBI who testified that he did a review of [Appellant's] cell phone information using various TMobile Towers including towers with coverage areas from a Hilton Garden Inn, Preeti's Pit[t], two License Plate reader locations, a residence in Castle Shannon, the crime scene and the Homeville Trolley Stop. Agent Orlando testified that his review of [Appellant's] cell phone data showed that on July 7, 2018 there were three phone calls and one text message between 8:52 p.m. and 9:38 p.m. (incoming at 9:14 p.m.; outgoing at 9:15 p.m.; and, incoming at 9:38 p.m.) from a cell phone tower in the Homestead area. (*Id.* at 404). He also testified that between 11:15 p.m. on July 7 and 12:31 a.m. on July 8 the data showed an incoming voice call at 11:59 p.m. and outgoing voice call at 12:00 a.m. and then text messages at 12:03 and 12:06 a.m. using a Braddock Hills and Rankin area tower. Special Agent Orlando also testified that there was no data regarding call activity between 12:30 a.m. and 5:03 a.m. on July 8, indicating the phone was either shut off or not in use. (*Id.* at 407). Agent Orlando then testified that the next activity was at 5:03 a.m. on July 8 utilizing a cell phone tower within the area of a license plate reader heading west on 1-376. (*Id.* at 408-409). The last activity was on July 8, 2018 at 6:23 a.m. which was an incoming call and it used the tower that would provide coverage to the Castle Shannon area, including the residence. (*Id.* at 409).

The Commonwealth also presented the testimony of several additional witnesses addressing forensic and scientific evidence, as well as testimony of other lay witnesses, whose

testimony is not relevant to the issues raised on appeal. The Commonwealth argued that [Appellant] shot and killed Moore after leaving Secrets in Homewood and then dumped his body in North Versailles. It was argued that he then drove back to the apartment in Castle Shannon to change his clothes before driving to the South Side and setting the vehicle on fire and then returning to his apartment using the bus and trolley.

[Appellant] presented the testimony of an investigator, Ken Bozich, regarding the travel times between various locations identified during the testimony. [Appellant] argued these times were consistent with Moore or Mahone's driving the car after Moore dropped [Appellant] off at his apartment at 4:30 a.m. [Appellant] also presented the expert testimony of Dr. Robert Levine to address the issue of the types of firearms that could have been used to cause Moore's fatal head wound, arguing it was not necessarily of the caliber [Appellant] owned. [Appellant] argued that the detectives centered their investigation on him as he was the one that rented the car and they failed to investigate Mahone or others who were with Moore on the night he was killed. [Appellant] argued that although license plate readers identified his car in various locations during the early morning hours of July 8, it did not identify him as the driver. He also argued that video obtained from Secrets, did not show him, Moore or Mahone at Secrets, which called into question Mahone's credibility regarding the events that night.

(Trial Court Opinion at 2-7) (record citation formatting provided; footnotes and some record citations omitted).

On March 20, 2023, at docket No. 0887, the jury found Appellant guilty of first-degree murder, firearms not to be carried without a license, and tampering with evidence. At docket No. 0888, the jury found Appellant guilty of arson—danger of death or bodily injury, recklessly burning, and criminal mischief. On June 30, 2022, the trial court sentenced Appellant at docket No.

0887 to life imprisonment for first-degree murder and imposed a consecutive sentence of 12 to 24 months' imprisonment for the firearms conviction.[2] At docket No. 0888, the court sentenced Appellant to a consecutive 36 to 72 months' imprisonment for the arson conviction.[3] Appellant timely filed post-sentence motions on July 8, 2022. With leave of court, he filed an amended post-sentence motion on September 6, 2022. The trial court denied the post-sentence motions on November 14, 2022. Appellant filed separate timely notices of appeal at each docket on November 17, 2022, together with voluntary concise statements of errors complained of on appeal. On December 23, 2022, this Court consolidated Appellant's appeals *sua sponte*.

Appellant raises the following four issues on appeal:

> 1. Whether the [c]ourt erred in denying suppression of [Appellant's] July 8, 2018 statement to police when [Appellant] was in the functional equivalent of custody and not advised of his constitutional rights prior to making that statement?
>
> 2. Whether the [c]ourt erred and/or abused its discretion in denying, solely on the basis of [Appellant's] representation by privately-retained counsel, the requests for public funds to retain an expert to analyze cell phone location data?
>
> 3. Whether the [c]ourt erred in allowing [Appellant] to waive his presence on the first day of jury selection (March 21, 2022) when the waiver colloquy failed to inform [Appellant] that his absence may limit or otherwise compromise issues

---

[2] The court imposed no further penalty for Appellant's conviction of tampering with evidence.

[3] Appellant's convictions for reckless burning and criminal mischief merged for sentencing purposes.

(including ineffectiveness of counsel) related to jury selection?

4. Whether the [c]ourt erred and/or abused its discretion in curtailing and otherwise interfering with [Appellant's] right of allocution under 42 Pa.C.S.[A.] § 9752([a])(2) and/or Pa.R.Cr[im].P. 704(C)(1) in not informing [Appellant] that statements in allocution should address the sentence to be imposed (including expression of remorse, acceptance of responsibility, plea for mercy/leniency, and other evidence in mitigation) before imposing sentence?

(Appellant's Brief at 5).

In his first issue, Appellant argues that the officers' show of force when they arrived at his residence was so great that it constituted the functional equivalent of custody, which would have required the officers to provide *Miranda*[4] warnings prior to questioning him. Specifically, Appellant asserts that four officers arrived at his residence and, although he initially told them not to come in without a warrant, they came in after his girlfriend relented and allowed the officers to enter. Appellant claims that the officers essentially blocked his exit by remaining at the door until they were permitted entry into the home. Appellant also contends that the officers focused their investigation and questioning on him and continued questioning him while withholding information about Moore's death and the burnt car. Appellant insists that the show of force and the officers' actions resulted in Appellant not being free to leave during questioning. Appellant concludes that he was subjected to the

_____

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

equivalent of a custodial interrogation without proper **Miranda** warnings, and the trial court erred in denying his motion to suppress statements made during this interrogation. We disagree.

"Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." **Commonwealth v. Williams**, 941 A.2d 14, 26 (Pa.Super. 2008) (*en banc*) (internal citations omitted).

> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

**Id.** at 27 (internal citations and quotation marks omitted). This Court's scope of review is limited to the evidentiary record of the pre-trial hearing on the suppression motion. **In re L.J.**, 622 Pa. 126, 79 A.3d 1073 (2013).

Generally, statements made during a custodial interrogation are presumptively involuntary, unless the police first inform the accused of his **Miranda** rights. **Commonwealth v. DiStefano**, 782 A.2d 574, 579 (Pa.Super. 2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002). "Custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" **Williams, supra** at 30 (quoting

*Miranda, supra* at 444, 86 S.Ct at 1612, 16 L.Ed.2d at 706).

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Commonwealth v. Gaul*, 590 Pa. 175, 180, 912 A.2d 252, 255 (2006), *cert. denied*, 552 U.S. 939, 128 S.Ct. 43, 169 L.Ed.2d 242 (2007). "[I]n evaluating whether *Miranda* warnings were necessary, a court must consider the totality of the circumstances." *Id.*

> Interrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect. [I]n evaluating whether *Miranda* warnings were necessary, a court must consider the totality of the circumstances. In conducting the inquiry, we must also keep in mind that not every statement made by an individual during a police encounter amounts to an interrogation. Volunteered or spontaneous utterances by an individual are admissible even without *Miranda* warnings.
>
> Whether a person is in custody for *Miranda* purposes depends on whether the person is physically denied of [his] freedom of action in any significant way or is placed in a situation in which [he] reasonably believes that [his] freedom of action or movement is restricted by the interrogation.
>
> Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes [his] freedom of action is being restricted.
>
> Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.
>
> Thus, the ultimate inquiry for determining whether an

- 11 -

individual is in custody for ***Miranda*** purposes is whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. Under the totality of the circumstances approach, the following factors are relevant to whether a detention has become so coercive as to constitute the functional equivalent of a formal arrest: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions.

***Williams, supra*** at 30–31 (citations and internal quotation marks omitted).

Instantly, Detective Patrick Kinavey testified at the suppression hearing that he and his partner were called to investigate the murder of Mr. Moore after his body was discovered on the side of the roadway. Based on the scene, the detective believed that the body had been dumped from a vehicle, and he called the Allegheny County 911 center for information on recent car fires. Detective Kinavey received a report of a vehicle fire for a vehicle with a license plate that, earlier that day, had been located by a license plate reader in the area where the body was found. Detectives ascertained that the car was rented by Appellant, and at about 6:45 p.m., went to his residence to speak to Appellant about the vehicle.

When they arrived at the apartment, the detectives were accompanied by two Castle Shannon police officers, one of whom stayed in the hallway, and the other remained in the doorway recording the encounter with his bodycam. The Commonwealth introduced the bodycam recording from the apartment, which showed Appellant's girlfriend, the leaseholder, answering the door and

granting the police entry into the home. (N.T. Suppression Hearing, 12/10/19, at 19, 23). After Appellant left the bedroom, the detectives suggested he get dressed and come talk to them. Appellant asked about a warrant, and Detective Kinavey explained that they were not going to look around, rather they were "just here to talk to you about your car." (Commonwealth Exhibit 1, Transcript of Bodycam Recording, at 4). After Appellant explained that he did not have the keys to the car, officers asked him about his whereabouts the evening before, and who else was with him. (*Id.* at 9-10). A couple of minutes into the conversation, Appellant asked whether there was a problem, explaining to the officers that they were making it seem like it was something more. (*Id.* at 13-14). The detectives continued to ask Appellant about the car, and about a gun that Appellant told them was left in the trunk of the car. (*Id.* at 19-21). After Detective Kinavey told Appellant that police had found the car, and that it had been "torched," Appellant offered to provide a phone number for "Bud" who he claimed had been driving the car the evening prior.[5] (*Id.* at 24-25). Appellant told the detectives that his phone needed to charge before giving them the number, and he could call them back, but after agreeing that it would only take a minute for it to power on, the detectives said they would wait for the phone number. (*Id.* at 27-28). While the phone was charging, detectives asked

_____

[5] Testimony at trial confirmed that the victim, Zachary Moore, often went by the nickname "Bud."

about "Bud" and whether he knew about the gun in the car, and more about

Appellant's activities the night before. After Appellant gave the detectives the

phone numbers that he had for "Bud" the detectives told him they might be

back in contact with him and left the residence. The entire encounter lasted

approximately 32 minutes. At the suppression hearing, Appellant testified

that he was surprised, shocked, and frightened, and that he was contained in

the apartment because officers were blocking the way out. Nevertheless,

Appellant also admitted that he never asked the officers to leave.

The trial court explained its decision to deny Appellant's motion to

suppress as follows:

> In this case, when considering the totality of the
> circumstances, the interaction or questioning of [Appellant]
> in his home did [not] constitute [Appellant] being in custody
> or the functional equivalent of an arrest. The detectives
> responded when asked that they did not have a warrant and
> asked if they could enter the apartment and speak to
> [Appellant] and they were invited in. At no time did
> [Appellant] or his girlfriend ask the detectives to leave. As
> noted, when [detectives] asked [Appellant] to step into the
> hallway and talk, he declined and said he preferred to talk
> in the living room. [Appellant] was never restrained or
> transported against his will. In fact, [Appellant] moved
> about the apartment and Detective Kinavey only followed
> him to the bedroom door for his safety to assure that
> [Appellant] was not accessing a firearm or other weapon.
> The interaction was extended, in part, as a result of
> [Appellant] charging his phone to supply phone numbers to
> the detectives, but still only lasted approximately 32
> minutes. The detectives never threatened or used force and
> the mere fact that they were carrying firearms did not
> constitute placing [Appellant] in custody or under arrest. It
> is also clear that there was a legitimate basis to question
> [Appellant] as he was renting a car that was burned and the
> detectives wanted to determine if he was safe or if he had

> any information about the circumstances surrounding the use of the vehicle. …
>
> [In addition,] Detective Kinavey credibly testified that, as [the detectives] were in plain clothes, the [Castle Shannon Police] officers not only were present to identify them as police but also for their safety as they were in and about the apartment building. One of the officers was present in the doorway to record the encounter on his body camera and the other was in the outside hallway. These officers did not restrain or restrict [Appellant] and there were no actions on their parts which constituted placing [Appellant] in custody. Based on the totality of the circumstances, the interaction between the detectives and [Appellant] did not constitute a custodial interrogation and, therefore, the Motion to Suppress was appropriately denied.

(Trial Court Opinion at 10-11).

We agree with the trial court that the encounter between Appellant and the detectives was not the equivalent of a custodial interrogation. *See Williams, supra*. As the court noted, during the 32-minute interview, Appellant answered the officers' questions about his rental car. Appellant did not ask the officers to leave, and there was no testimony that police restrained his freedom of movement at any time during the encounter. On this record, we see no reason to disturb the suppression court's decision to deny relief on this issue. Appellant's first issue is meritless.

In his second issue, Appellant claims that the trial court abused its discretion when it denied his request for public funds to retain an expert to analyze cell phone location data. Appellant asserts that he was represented by publicly funded counsel until August 2019, at which point his mother paid to retain private counsel. Although Appellant's mother paid $1,100 for a

private investigator, Appellant insists that his mother did not have additional funds to pay an expert in cell phone data. Appellant insists that despite his mother retaining counsel to represent him, Appellant himself was indigent, as he had been in the Allegheny County Jail since his arrest and was unable to obtain gainful employment. Appellant contends that he established the need for an expert to interpret the cell phone location data, and such testimony would have been crucial to his success at trial. Appellant maintains that the court's error in denying funds for an expert was not harmless. Appellant concludes he is entitled to a new trial based on the court's denial of funds for an expert in cell phone location data. We disagree.

This Court has explained:

> It is well-established that indigent defendants have a right to access the same resources as non-indigent defendants in criminal proceedings. **Commonwealth v. Curnutte**, 871 A.2d 839, 842 (Pa.Super. 2005). The state has an "affirmative duty to furnish indigent defendants the same protections accorded those financially able to obtain them." **Commonwealth v. Sweeney**, 533 A.2d 473, 480 (Pa.Super. 1987). Procedural due process guarantees that a defendant has the right to present competent evidence in his defense, and the state must ensure that an indigent defendant has fair opportunity to present his defense. **Ake v. Oklahoma**, 470 U.S. 68, 76, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
>
> However, "[t]he provision of public funds to hire experts to assist in the defense against criminal charges is a decision vested in the sound discretion of the court and a denial thereof will not be reversed absent an abuse of that discretion." **Commonwealth v. Cannon**, 954 A.2d 1222, 1226 (Pa.Super. 2008), *appeal denied*, 600 Pa. 743, 964 A.2d 893 (2009) (citations omitted).

*Commonwealth v. Konias*, 136 A.3d 1014, 1019 (Pa.Super. 2016), *appeal denied*, 636 Pa. 673, 145 A.3d 724 (2016) (citation formatting provided).

In **Konias**, this Court explained that in deciding indigency for the purposes of appointing an expert, the trial court should look at principles established for what constitutes indigency in relation to a defendant's request for appointment of counsel. This determination includes "the information from the applicant regarding, present or past salary and wages, other types of income within the preceding year, other contributions for household support, property owned, available assets, debts and obligations, and persons dependent for support." **Id.** (citation and internal quotation marks omitted). There, this Court held that the appellant's failure to supply the trial court with financial information sustaining his inability to pay was fatal to his argument requesting funds for an expert. This Court stated that "[a] mere averment of indigency and inability to pay is not sufficient to trigger the necessity for a hearing under **Cannon,** [**supra**]. The defendant must make some specific showing of a financial hardship for the court to afford relief." **Id.** at 1021.

Here, Appellant's motion requesting public funds for a digital forensic expert explained the need for a digital forensic expert and attached the CV and the fee required for a forensic certified wireless analyst. Nevertheless, Appellant did not make any showing of his financial hardship. (**See** Motion Requesting Funds for Digital Forensic Expert, filed 9/9/21). At the hearing on Appellant's motion, defense counsel referenced a notarized statement from

Appellant's mother indicating the amount of money that she had already paid a private investigator.[6] (*See* N.T. Hearing, 9/22/21, at 4). Yet, there was no documentation relating to Appellant's personal financial circumstances, nor any averment of Appellant's personal indigency.

On this record, we must conclude that Appellant did not make a specific showing of a financial hardship necessary to prove entitlement to public funds for an expert witness. Appellant did not allege that he was entitled to funds for an expert based on indigency, and even if he had made that assertion, he failed to include any of the necessary information to assess his indigency and entitlement to funds. *See Konias, supra*. Although Appellant now asserts his indigency, he failed to make such arguments with evidentiary support in the trial court. Thus, we conclude that the trial court did not abuse its discretion when it denied his request for public funds for an expert witness. *See id.*

In his third issue, Appellant claims that the trial court erred when it allowed him to waive his presence on the first day of jury selection. Specifically, Appellant argues that the waiver colloquy provided by the court failed to inform him that his absence might limit any future claims concerning ineffective assistance of counsel during jury selection. Appellant contends that the trial court's focus on his intent to delay trial is misplaced. Appellant

---

[6] The notarized statement does not appear in the certified record or supplemental certified record.

insists that because the court failed to discuss the fact that his waiver could compromise future claims of ineffectiveness, his waiver was not knowing or intelligent. Appellant concludes he is entitled to a new trial under these circumstances. We disagree.

It is well settled "that *voir dire* is a critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present." **Commonwealth v. Hunsberger**, 619 Pa. 53, 62, 58 A.3d 32, 37 (2012) (citing **Gomez v. United States**, 490 U.S. 858, 873, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989)). However, this "right may be waived either impliedly, via the defendant's actions, or expressly." **Commonwealth v. Faulk**, 928 A.2d 1061, 1066 (Pa.Super. 2007), *appeal denied*, 596 Pa. 715, 944 A.2d 756 (2008). "For example, our Supreme Court has held that when a defendant is abusive and disruptive to the proceedings, the trial judge does not abuse his or her discretion in having the defendant removed from the courtroom." **Id.** "Furthermore, a defendant may be tried in absentia if he or she is absent without cause when the trial is scheduled to begin or if the defendant absconds without cause after the trial commences." **Id.**

> A criminal defendant can also expressly waive his right to be present at his trial; however, our Supreme Court has imposed certain requirements to ensure that such a waiver is knowing and intelligent. [**Commonwealth v. Vega**, 553 Pa. 255, 259–62, 719 A.2d 227, 230-31 (1998).] The trial court must conduct a colloquy to communicate to the accused the nature of the constitutional right to be present at trial and the risks of failing to exercise this right. **Id.** at 260, 719 A.2d at 230. While our Supreme Court did not mandate any specific language or rote dialogue for this

colloquy, the Court did state that "the inquiry must be calculated to insure a defendant is aware of the dangers and disadvantages of waiving his right to be present during trial." *Id.* at 262, 719 A.2d at 231.

> Such an inquiry would necessarily include, at a minimum, a discussion of whether the defendant understands that if trial proceeds without his presence: (1) he would be unable to participate in the selection of a jury; (2) he waives his right to confront and cross-examine witnesses; (3) he will not be present to testify in his own defense; and (4) any claim challenging effective assistance of counsel will be severely limited since the defendant has chosen not to participate in his defense and will be unable to aid counsel during trial.

*Id.*

> When we as an appellate court review a challenge to the validity of a waiver of the right to be present at trial, we look to the record to determine whether all the necessary information concerning the nature of the right and the risk of not exercising that right was communicated to the appellant. If such information was communicated to the appellant, the waiver will not be disturbed. *See id.* at 260, 719 A.2d at 230. "The focal point of this analysis is whether the [a]ppellant made an informed choice." *Id.*

*Faulk, supra* at 1066–67.

Instantly, at the start of jury selection, Appellant indicated that he did not want to pick a jury until he had the opportunity to speak with the trial court concerning a *pro se habeas corpus* petition that he wanted to argue. Appellant stated that trial counsel's decision not to argue the motion on his behalf deprived him of the right to effective counsel. Appellant requested that the court appoint counsel to argue the petition on his behalf and asserted that he did not want to waive any pretrial matters. (N.T. Trial, 3/21/22, at 5-6).

- 20 -

After the court told Appellant that the motion was denied, Appellant stated that he did not want his counsel and was firing her, and then exited the courtroom. (*Id.* at 6). The following exchange then occurred:

> THE COURT: For the record, [Appellant] is not present.
>
> What is the problem [Defense Counsel]?
>
> [DEFENSE COUNSEL]: My client is refusing to pick because he no longer wants me to represent him.
>
> THE COURT: That is the oldest trick in the book, but go ahead. What is the reason he wants to fire you?
>
> [DEFENSE COUNSEL]: Well, he wants to fire me because I haven't filed a *habeas* motion on his behalf, and this has been an ongoing thing between us…..
>
>                 \*     \*     \*
>
> THE COURT: Let me ask you this. Why won't your client participate in jury selection?
>
> [DEFENSE COUNSEL]: He won't participate in jury selection because, number one, I didn't file a *habeas* motion on his behalf, and, number two, because I won't argue the *habeas* motion that he filed *pro se*, which my understanding is I'm not permitted to do. Even if I was permitted to do that, I would not argue on the *habeas* motion that he filed because it is not based on fact and is just a general statement of his—I cannot in good faith file the *habeas* motion.

(N.T. Trial, 3/21/22, at 6-8). The court then asked for Appellant to be brought into the courtroom to put onto the record Appellant's choice not to participate in jury selection. After Appellant insisted that he wanted his pretrial petition to be heard, the court explained the following:

> THE COURT: Here is what we are going to do. [Defense counsel] is your attorney. This is the third one you have

- 21 -

had. She is privately retained. She is going to pick a jury. If there [are] any arguments that she wants to make before we bring the jury in and swear them in, we will do it at that time.

Now, you can assist her in the jury selection process by being there, or you can sit down in the bullpen and she will do it without you there. That would deprive you of the right to have any input as to the various jurors that you would want to discuss with her, how you felt about them. And also your presence not being there, that can be a little prejudicial towards you.

I am not going to have you on the date of trial tell me that you are going to fire your lawyer. That is the oldest trick in the books….

(*Id.* at 9-10).

Appellant responded to the court that it was against his "constitutional rights" and that the court "can't force [him] to go to trial." (*Id.* at 11). Appellant explained that he wanted counsel to file and argue a pretrial motion on his behalf and asserted that he would not go to trial until that was done. Counsel reiterated the frivolity of the *pro se* motion at this stage in the proceedings and asserted that a legitimate motion may be possible after completion of cross-examination. The court reiterated to Appellant:

THE COURT: [Counsel] put together a defense, and today is the day of your jury trial. What you could do is you could participate in the jury selection with your attorney, or you can sit in the bullpen and not be there and she will be forced to pick without you there. I think it would be better if you were with her so she can discuss with you whether you like a particular juror or not, but that's a decision up to you.

(*Id.* at 14-15). The court asked whether Appellant wished "to participate in the jury selection process with your attorney, or do you wish to sit in the

bullpen while she does it? That's your choice, one or two." (***Id.*** at 15). Appellant responded, "I'm not going to answer it." (***Id.***) After the court repeated the question, Appellant stated that he would not participate in jury selection. The court then explained that it would begin jury selection without him, and jury selection commenced thereafter. (***Id.*** at 16). Part-way through jury selection, after eight jurors were selected, Appellant then decided to participate in the jury selection process. (***Id.*** at 17-20).

Upon review, we conclude that Appellant made a knowing waiver of his right to be present for jury selection. The trial court deemed Appellant's attempt to litigate a frivolous *pro se habeas corpus* petition when it was time to select a jury as a tactic meant to delay the start of trial, and the trial court was well within its authority to avoid unnecessary delay. ***See Faulk, supra***. The court made clear to Appellant the importance of his presence during jury selection and that he could be prejudiced if he chose not to participate. Although the court did not specifically delineate every form of prejudice that Appellant would suffer if he chose not to be present during jury selection, the court's repeated colloquies were sufficient to "insure [Appellant was] aware of the dangers and disadvantages of waiving his right to be present during trial." ***Id.*** at 1066 (citation omitted). Thus, Appellant's third issue merits no relief.

In his fourth and final issue, Appellant contends that the trial court erred when it failed to explain to him the scope of what matters he should address in making a statement in allocution during sentencing. Appellant argues that

although the court informed him that he could address the court during sentencing, he was also advised that he should remain silent until he spoke with his attorney, because anything said could affect a later appeal. Appellant claims that when the court asked him to wrap up his statement during sentencing, it denied him his right to allocution. Appellant concludes that this Court must vacate and remand for a new sentencing hearing on this basis. We disagree.

"The right to allocution is of ancient origin and requires the court to inform a defendant that he has the right to address the court prior to sentencing." *Commonwealth v. Hague*, 840 A.2d 1018, 1019 (Pa.Super. 2003), *appeal denied*, 583 Pa. 687, 878 A.2d 863 (2005). The general right to allocution is set forth in Pa.R.Crim.P. 704(C)(1), which provides:

> At the time of sentencing, the judge shall afford the defendant the opportunity to make a statement in his or her behalf and shall afford counsel for both parties the opportunity to present information and argument relative to sentencing.

Pa.R.Crim.P. 704(C)(1). "[A] defendant's right to personally address the court prior to sentencing, and thereby plead for mercy, is of paramount importance." *Commonwealth v. Hardy*, 99 A.3d 577, 580 (Pa.Super. 2014) (citation omitted).

This Court has held that to properly afford a defendant the right to allocution, a sentencing court must directly alert a defendant that he has the right to personally address the court. *Hague, supra* at 1020 (holding that

court's inquiry "is there anything in addition you want to say" was insufficient to inform appellant of his right to speak to court).

Instantly, the trial court asked at sentencing whether Appellant had anything that he wanted to say. The court explained that anything that Appellant said on the record could affect a later appeal and suggested that he may want to wait and consult with his newly appointed appellate attorney before speaking. (N.T. Sentencing, 6/30/22, at 4-5, 21). Appellant stated that he understood, and then proceeded to give his statement without any prior discussion with counsel, wherein he presented arguments concerning the insufficiency of the Commonwealth's case against him and raised claims of prosecutorial misconduct. (*Id.* at 23-25). The trial court interjected at this point suggesting that these claims were better discussed with his appellate attorney; however, Appellant asserted that he "ha[d] the right to allocution" and continued his statement. (*Id.* at 26). Thereafter, Appellant continued to set forth several claims of ineffective assistance of trial counsel and argue about various errors that occurred during the trial. The court again explained that the errors being asserted would be dealt with during the first stage of any appeal. Appellant protested that he wanted "to finish [his] right to be heard." (*Id.* at 32). After twenty minutes of legal argument, the court again explained to Appellant that he would have an attorney who would present all the legal arguments on appeal. The court then moved on and imposed its sentence.

In its opinion, the trial court addressed Appellant's claim as follows:

It is clear that [Appellant] was given his right of allocution. To the extent that he now argues that he was not advised that any statement that he made should address the sentence to be imposed as well as expressions of remorse, acceptance of responsibility, plea for leniency, or other evidence in mitigation of the sentence, it is clear that [Appellant] was not accepting responsibility or expressing remorse. He only expressed his condolences for the family's "loss" that he clearly stated he was not responsible for. In light of his refusal to speak to counsel about his allocution statement or even discuss with counsel the presentence report, [Appellant] was appropriately cautioned that statements that he made during his allocution statement might be used against him. [Appellant] was given great latitude in making his statement but when it became clear that the statement was nothing more than recitations of rules of law that he believed were violated during trial, then it was appropriate to limit his statement and proceed with sentencing.

(Trial Court Opinion at 19).

The record supports the trial court's determination that Appellant was not denied his right of allocution. The court permitted Appellant to exercise his right of allocution and Appellant did so at sentencing. *See Hague, supra*. To the extent Appellant now suggests that the court should have explained to him what his statement should have entailed, Appellant cites no legal authority requiring a court to advise a defendant how to execute his right of allocution and what a statement in allocution should entail. *See* Pa.R.A.P. 2119(a) (requiring appellant to cite relevant legal authority in support of claims on appeal). Because Appellant was provided his right of allocution, his fourth and final issue is meritless.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/29/2024